EXHIBIT 1



June 26, 2024

**SENT VIA EMAIL (ICE-FOIA@ICE.DHS.GOV)**

U.S. Immigration and Customs Enforcement ("ICE")
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

Re:    **FOIA Request**

      The Lawyers' Committee for Civil Rights of the San Francisco Bay Area ("LCCRSF" or "Requester") submits this letter as a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.* Requester seeks a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k), and expedited processing, pursuant to 6 C.F.R. § 5.5(d) and 5 U.S.C. § 552(a)(6)(E). Requester's entitlement to the fee waiver and expedited processing are set out in detail following the request for information.

## I.   REQUEST FOR INFORMATION

      Requester seeks all records[1] listed below in the possession or control of the U.S. Immigration & Customs Enforcement (ICE)[2]. All specific requests for information relate to Golden State Annex, the facility with which ICE contracts to detain noncitizens, located at 611 Frontage Road, McFarland, California 93250. ICE retains and exercises legal custody over individuals detained at GSA. GEO Group, Inc. ("GEO"), a private corporation, merely operates GSA at ICE's behest in exchange for compensation. As such, any document within GEO's possession relating to the operation of GSA and detention of noncitizens is plainly within ICE's control. *See, e.g., Ahn v. GEO Group, Inc.*, 1:22-cv-00586-CDB, ECF 64-1 at 466 (E.D. Cal)

---

[1] The term "records" as used herein includes, but is not limited to: communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications and/or videotapes, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations

[2] The term "ICE" as used herein means ICE headquarters offices, including any divisions, subdivisions or sections therein; ICE's San Francisco Field Office; and/or any other ICE organizational structures that have possession, custody, and/or control over the requested information.

("The Contractor shall safeguard all records related to the operation of the facility. All records will remain the property of the U.S. Government."). Requester asks that ICE produce all records within the scope of the specific requests, even if ICE must first obtain those records from GEO. This is an ongoing FOIA request, such that any records that come within ICE's possession prior to a final response to this FOIA request are within the request's scope.

The requested records include:

1) All records related to any and all complaints[3] made by any detained individual housed in GSA Housing Unit A4[4] on any day on or between January 1, 2024 to June 1, 2024, about access to basic necessities, including, but not limited to, toilet paper, water, toothpaste, cleaning equipment, indoor temperature control, recreation, batteries, and food, for individuals currently in the dorm and on behalf of individuals in solitary confinement.

2) All records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024.

3) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4.

4) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the exterior of Housing Unit A4, including, but not limited to the surrounding hallways, doors, and windows.

5) All audio and/or video files including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59am April 8, 2024 to 12:01am April 16, 2024, that capture any detained individual who was then-presently assigned to Housing Unit A4 at any time during the specified date range.

6) All relevant policies and procedures for retaining audio and/or video files and records sufficient to show compliance/noncompliance therewith.

7) All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.

8) All documents related to any search for contraband, or any other prohibited item, that was planned for or actually conducted between 11:59pm April 1, 2024 to 12:01am April 16, 2024, including, but not limited to:

---

[3] ICE should construe any request that uses the term "complaint" to refer to formal grievances (whether provided in writing or electronically through the facility's tablets), verbal complaints or notifications made by detained people to GEO staff and/or ICE, reports made to ICE including to the Office of the Immigration Detention Ombudsmen from detained people or GEO staff, and any other form of notice communicated by a detained individuals.

[4] ICE should construe any request that uses the term "Housing Unit" to include records that contain similar terms, including, but not limited to "dormitory," "dorm," or simply the letter and number combination that is assigned to the location where groups of detained individuals are housed inside of the facility.

    a. Any investigations conducted prior to any search for contraband, and

    b. Records sufficient to identify the basis or bases for the search of Housing Unit A4

    c. Records sufficient to identify the basis for searching the body or belongings of any individuals housed in Housing Unit A4

    d. Any communications regarding any planned or conducted search for contraband.

9) Records sufficient to show all equipment utilized to conduct any search for contraband that was planned for or actually conducted between 11:59am April 14, 2024 to 12:01am April 16, 2024, including but not limited to restraint devices, impact weapons, batons, oleoresin capsicum spray,[5] chemical agents, tactical gear, and personal protection equipment.

10) Records sufficient to show the personnel involved in the planning and/or execution of any search for contraband that was planned for or actually conducted between 11:59pm April 15, 2024 to 12:01am April 16, 2024, including, but not limited to:

    a. The rank, position, or title of the individuals involved in any phase of a contraband search;

    b. The number of individuals involved in any phase of a contraband search; and

    c. The rank, position, or title of any ICE employee who received notice of a contraband search at any stage.

11) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process.

12) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for conducting searches of detained individuals, including, but not limited to, pat downs, strip searches, cavity searches, and visual inspections.

13) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling personal property owned by individuals detained at the facility.

14) All records related to reports of lost or damaged personal property made on or between April 14, 2024 to June 1, 2024, by any individual who was assigned to GSA Housing Unit A4 on any day during that period, including but not limited to:

    a. Forms I-387 Report of Detainees Missing Property;

    b. Reports, oral or written, of allegations of staff mishandling of personal property owned by detained persons; and

    c. Requests, oral or written, for reimbursement of commissary.

15) All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

---

[5] ICE should construe any request that uses the term "oleoresin capsicum spray" to include records that contain similar terms, including, but not limited to "OC spray," "pepper spray," "mace," or any other similar term.

16) Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property.

17) Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

   a. Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;
   b. Procedures for handling cellular devices confiscated from detained individuals.

18) All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to,

   a. Forms G1025 submitted by GSA to ICE; and
   b. Records of investigation conducted by ICE.

Any records that exist in electronic form should be provided in their native electronic format on a compact disc, digital videodisk, or equivalent electronic medium. Any documents stored in Portable Document Format ("PDFs") should be provided as individual files in a searchable PDF format. Any records produced in PDF, TIFF, or other image formats must be produced in full, uncompressed form; do not compress images or alter the resolution, as this interferes with their legibility. Finally, Requester asks that ICE transmit reasonable metadata along with files, including but not limited to maintaining parent-child relationships between emails and their attachments, author information, as well as date and time stamp information. To facilitate a speedy response, Requester asks that records responsive to this request be produced on a rolling basis.

All requested records that are responsive may be provided with personally identifying details redacted according to 5 U.S.C. § 552(b)(6). Requester expects the release of all segregable portions of otherwise exempt material.

If, under applicable law, any of the information requested is considered exempt, please describe in detail the nature of the information withheld, the specific exemption or privilege upon which the information is withheld, and whether the portions of withheld documents containing non-exempt or non-privileged information have been provided.

## II.  REQUEST FOR EXPEDITED PROCESSING

Requester seeks expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). Expedited processing is appropriate, under 6 C.F.R. § 5.5(e)(1), because this FOIA request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information" and "[a] matter of widespread and

exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

LCCRSF is a nonprofit entity under Section 501(c)(3) of the Internal Revenue Code. Dedicated to ensuring civil rights protections and access to justice for all immigrants, refugees, and asylum seekers, LCCRSF provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. LCCRSF's primary purpose in making this FOIA request is to inform the legal community and the public, specifically in California, about the detention of noncitizens at GSA. Providing the requested information on an expedited basis is justified because the information will contribute to public understanding of current practices at GSA, as well as identifying potential grounds for seeking adjustment to such practices. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (ordering expedited processing where information dissemination is an "activity of the requestor" even if not its "sole occupation"); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing for an organization that "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by the Department of Justice").

## III. REQUEST FOR WAIVER OF FEES

LCCRSF is also eligible for waiver of any fees associated with this FOIA request. Such a waiver is warranted because disclosure of the information is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge or at a reduced rate if the information is in the public interest, and disclosure is not in commercial interest of institution). In addition, LCCRSF can widely disseminate the requested information to its networks of immigrants' rights organizations and to the public. *See Judicial Watch v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) (finding a fee waiver appropriate when the requester explained how and to whom it would disseminate the information it received).

As described above, LCCRSF is a non-profit organization committed to increasing public understanding of immigration law and policy, advocating for the fair and just administration of civil rights laws, and protecting the legal rights of noncitizens and citizens alike. LCCRSF utilizes information it receives in response to public records requests to increase community awareness of matters of public concern. *See, e.g.*, *Civil Assessments: The Hidden Court Fee That Penalizes Poverty*, https://lccrsf.org/wp-content/uploads/2022/03/Civil-Assessments-Report-FINAL.pdf; *Cited for Being in Plain Sight: How California Polices Being Black, Brown, and Unhoused in Public*, https://lccrsf.org/wpcontent/uploads/LCCR_CA_Infraction_report_ 4WEB-1.pdf. The purpose of this request is not commercial gain, rather as a not-for-profit organization, Requester seeks the information to execute its commitments and obligations to the public.

****

Please provide the applicable records to:

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

Email: vpetty@lccrsf.org
Phone: 415-543-9444

Thank you, in advance, for your prompt attention to this request.

_____
Victoria C. Petty

# EXHIBIT 2

**From:**            ice-foia@ice.dhs.gov <noreply@securerelease.us>
**Sent:**            Tuesday, July 9, 2024 10:16 AM
**To:**              vpetty@lccrsf.org
**Subject:**         ICE FOIA 2024-ICFO-43541


07/09/2024


Victoria  Petty
131 Steuart St #400
San Francisco, California 94105


RE:      ICE FOIA Case Number 2024-ICFO-43541

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs
Enforcement (ICE), dated 6/26/2024, and to your request for
expedited treatment. Your request was received in this office on 6/26/2024. Specifically, you requested  records related
to any and all complaints3 made by any detained
individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. records related to
any and all uses of force, physical restraint devices
or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed
by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video files,
including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from
11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All
records related to any group demonstration planned and/or carried out by detained individuals on April 13,
2024.Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling
contraband,
including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband,
and the preservation, inventory, and storage of
contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where
such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the
treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's
contract with ICE.


Your request for expedited treatment is hereby denied.


Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves
"circumstances in which the lack of expedited treatment could
reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i),
or "an urgency to inform the public about an actual or
alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. §
5.5(e)(l)(ii).  Requesters seeking expedited processing
must submit a statement explaining in detail the basis for the request, and that statement must be certified by the
requester to be true and correct.  6 C.F.R. § 5.5(e)(3).

1

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA
regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your
request, the FOIA does permit a 10- day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search,
ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you care to narrow the scope of your request, please contact our office. We
will make every effort to comply with your request in a timely manner.

Provisions of the FOIA allow us to recover part of the cost of complying with your request.  We shall charge you for records in accordance with the DHS Interim FOIA
regulations as they apply to non-commercial requesters.  As a non-commercial requester, you will be charged 10 cents per page for duplication; the first 100 pages are free, as are the first two hours of search time, after which you will pay the per quarter-hour rate ($4.00 for clerical personnel, $7.00 for professional personnel, $10.25 for managerial personnel) of the searcher.  We will construe the submission of your request as an agreement to pay up to $25.00. You will be contacted before any further fees are accrued.

If you deem the decision to deny expedited treatment of your request an adverse determination, you have the right to appeal.  Should you wish to do so, you must send your
appeal and a copy of this letter, within 90 days of the date of this letter following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.5(e)(2). You may
submit your appeal electronically at GILDFOIAAppeals@ice.dhs.gov or via regular mail to:

> U.S. Immigration and Customs Enforcement
> Office of the Principal Legal Advisor
> U.S. Department of Homeland Security
> 500 12th Street,, S.W., Mail Stop 5900
> Washington, D.C. 20536-5900

Your envelope and letter should be marked "FOIA Appeal."  Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of
releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed
with your request.

If you have any questions, please contact the FOIA office or Daniel Edgington, FOIA Public Liaison at 500 12th St. SW Stop 5009 Washington, DC 20536-5009 or (866) 633-
1182. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA
requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government
Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at
202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned tracking number 2024-ICFO-43541. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

# EXHIBIT 3

 Outlook

---

**Follow Up to Notice re 2024-ICFO-43541**

---

**From** Victoria Petty <vpetty@lccrsf.org>

**Date** Fri 7/19/2024 3:31 PM

**To**    ICE-FOIA <ice-foia@ice.dhs.gov>

**Cc**    Jordan Wells <jwells@lccrsf.org>

📎 2 attachments (320 KB)

2024.06.26 (filing date) ICE FOIA Request (1).pdf; 2024.07.09 ICE FOIA Receipt Acknowledgment (1).eml;

Dear Mr. Edgington (FOIA Public Liaison),

I write to request a phone call with you and additional information related to your office's acknowledgement of the FOIA request that I filed on behalf of our organization. For reference, I attached here (1) the FOIA request we submitted on June 26, 2024, the tracking number for which is 2024-ICFO-43541 and (2) the receipt notice we received from your office via email on July 7, 2024.

**Our Request**

We submitted our FOIA request on June 26, 2024, using the DHS "SecureRelease" platform online. That platform contains various text fields in which the requester may document the specific document requests, requests for expedited processing, and for fee waiver. However, the platform also permits the requester to attach documents. Given the length and detail of our request, we opted to direct your office to the document that we attached on the platform for the specific document requests, along with our qualification for fee waiver and expedited processing.

When we received your receipt notice on July 7, 2024, the letter only acknowledged the following requests:

> "[R]ecords related to any and all complaints3 made by any detained individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. [R]ecords related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.[]Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE."

The receipt notice only acknowledges a subset of the requests that we made on June 26, 2024. Specifically, the notice copies the text associated with requests numbers (1), (2), (3), (11), and (15). Our request, as filed, included 18 requests. **We ask that your office confirm that you received the full set of requests as attached here.**

<u>**Expedited Processing**</u>

Our office is in receipt of your denial of our request for expedited processing. We will file an appeal. However, the regulation text does not appear to require that an appeal be filed within 90 days of the notice as you state therein. **Please provide the legal basis for the 90-day appeal deadline.**

<u>**Fee Waiver**</u>

Your receipt notice did not include a position on our request for fee waiver. As noted in the original request filed on June 26, 2024, LCCRSF is a nonprofit organization engaged in advocacy and information dissemination. A fee waiver is warranted because disclosure of the information we requested is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge or at a reduced rate if the information is in the public interest, and disclosure is not in commercial interest of institution). **Please provide us with a position on our request for a fee waiver.**

Thank you in advance for your attention to these matters.

I can be reached by email (vpetty@lccrsf.org) or by phone (409-933-2697).

Sincerely,

Victoria Petty



**Victoria Petty** (she/her)
Staff Attorney
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, CA 94105
www.lccrsf.org

# EXHIBIT 4

 Outlook

---

**ICE FOIA 2024-ICFO-43541 Amended Acknowledgement**

**From** ice-foia@ice.dhs.gov <noreply@securerelease.us>

**Date** Thu 7/25/2024 9:02 AM

**To** Victoria Petty <vpetty@lccrsf.org>

07/25/2024

Victoria Petty
131 Steuart St #400
San Francisco, California 94105

RE: ICE FOIA Case Number 2024-ICFO-43541

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated 6/26/2024, your request for a waiver of all assessable FOIA fees, and your request for expedited treatment. Your request was received in this office on 6/26/2024. Specifically, you have requested records related to any and all complaints3 made by any detained individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024. Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request in a timely manner.

ICE evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations. These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met. I have considered the following factors in my evaluation of your request for a fee waiver:

(1) Whether the subject of the requested records concerns "the operations or activities of the government";

(2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;

(3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;

(4) Whether the contribution to public understanding of government operations or activities will be "significant";

(5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and

(6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have determined to grant your request for a fee waiver.

Your request for expedited treatment is hereby denied.

Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(e)(l)(ii).  Requesters seeking expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct.  6 C.F.R. § 5.5(e)(3).

Your request for expedited processing is denied because you do not qualify for either category under 6 C.F.R. § 5.5(e)(1).  You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally.  Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

If you deem the decision to deny expedited treatment of your request an adverse determination, you have the right to appeal.  Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.5(e)(2). You may submit your appeal electronically at GILDFOIAAppeals@ice.dhs.gov or via regular mail to:

> U.S. Immigration and Customs Enforcement
> Office of the Principal Legal Advisor
> U.S. Department of Homeland Security
> 500 12th Street,, S.W., Mail Stop 5900
> Washington, D.C. 20536-5900

Your envelope and letter should be marked "FOIA Appeal."  Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions please contact FOIA Public Liaison Daniel Edgington, at (866) 633-1182 or 500 12th St, SW Stop 5009 Washington, DC 20536-5009. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned reference number 2024-ICFO-43541. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

# EXHIBIT 5



August 30, 2024

**Via Email**

U.S. Immigration and Customs Enforcement Office of the Principal Legal Advisor
U.S. Department of Homeland Security
500 12th Street, S.W., Mail Stop 5900 Washington D.C. 20536-5900
GILDFOIAAppeals@ice.dhs.gov

**Re:    FOIA Appeal, ICE's Denial of Expedited Processing for 2024-ICFO-43541**

      The Lawyers' Committee for Civil Rights of the San Francisco Bay Area ("LCCRSF" or "Requester") submits this letter to appeal to the denial of expedited processing for FOIA Request 2024-ICFO-43541 (the "Request", attached as Exhibit A) by Immigration and Customs Enforcement ("ICE").  The Request, dated June 26, 2024, included 18 records requests related to incidents that occurred in April 2024 at Golden State Annex ICE Detention Facility ("GSA"). Specifically, people detained at GSA in dormitory A4 have reported that on April 15, 2024, dozens of officers in SWAT-like gear burst into their sleeping quarters in the early morning, gassing them with pepper spray, assaulting them, and subsequently stripping them down to their underwear for contraband searches.[1]

      In a correspondence transmitted via email on July 25, 2024 ("ICE's Response Letter", attached as Exhibit B), ICE acknowledged receipt of our request, stating it was received on June 26, 2024.  In ICE's Response Letter, the agency denied our request for expedited processing. Citing to 6 C.F.R. § 5.5(e)(1), ICE stated that our Request "failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally."

      ICE was mistaken to determine that the Request fell short of the standard for expedited processing.  The Department of Homeland Security's FOIA regulations set forth the following

---

[1] Complaint to Department of Homeland Security Office of Civil Rights and Civil Liberties, *Excessive Use of Force, Retaliatory Dragnet Searches, and Other Abuses Against People Detained at Golden State Annex ICE Detention Facility on and After April 15* (August 15, 2024).  Attached as Exhibit C.

four situations in which expedited processing will be granted: "(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information;  (iii) The loss of substantial due process rights; or iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  6 C.F.R. § 5.5(e)(1).  By use of the connector "or," the regulations make clear that a request need only meet one of the four justifications for expedited processing.  ICE could have found that the Request satisfied at least three of the four bases.[2]  Therefore, we request that on appeal ICE grant expedited processing.

### A. Denial of expedited processing threatens the physical safety of the people who survived the A4 Raid and threatens to chill constitutionally protected expression.

 According to evidence gathered through interviews, officials at GSA ordered the April 15 violent raid as punishment for peaceful sit-in protests.  Exhibit C, at 5 ("Lieutenant Garza informed a detained person that the A4 Raid was conducted to stop the dorm from "doing too much," as it already had by "staying in the hallway" and "pushing and pushing" for basic necessities.").  In the days leading up to April 15, residents of A4 sat in the hallways outside the dormitory on at least two occasions to demand toilet paper, ice, cold water, and cleaning supplies.  *Id*. at 2.  Their efforts were met with tanks of pepper spray showered on their bodies and in the air, searches conducted by cutting clothes off their bodies, and physical blows.  *See, e.g.*, *id*. at 3-5, 8.

The aftermath of these events left its victims physically and psychologically harmed.  One individual was tackled to the ground by four officers, resulting in injuries to his arms, testicles, pelvis and legs.  Exhibit C, at 6.  The chemicals burned people's skin and eyes, and they caused breathing disturbance.  *Id*. at 4.  Many people reported that the terror caused psychological damage such as panic attacks, nightmares, anxiety, and paranoia.  *Id*. at 6-7.  In the aftermath of the raid, guards dispersed the detained individuals to various locations, and the chaos left people without access to their medication that was left behind or lost during the raid.  *Id*. at 9.  These damages were a foreseeable consequence of the sweeping force incident.

Because incidents like the April 15 raid often are swept under the rug, people detained at GSA have repeatedly escalated to hunger strikes.  Most recently, on July 11, 2024, 42 people detained at GSA launched a hunger strike.[3]  Their demands include that GEO and ICE "stop

---

[2] The statements and arguments made in this appeal letter are non-exhaustive of all legal grounds supporting LCCRSF's entitlement to expedited processing.  LCCRSF reserves the right to advance the same, new, or alternative arguments in the course of this appeal, and in any potential litigation.

[3] *Migrants Launch Hunger Strike at Two Private ICE Detention Centers in California*, Democracy Now, https://www.democracynow.org/2024/8/7/headlines/migrants_launch_hunger_strike_at_two_private_ice_detention_centers_in_california (Aug. 7, 2024); *Protestan en San Francisco por inmigrantes en huelga de hambre en centros*

violating [their] own standards."[4]  Hunger strikes are unfortunately not uncommon at GSA and GEO's other nearby facility, Mesa Verde ICE Processing Center ("Mesa Verde"), where about 18 months ago, approximately 82 detained people engaged in a hunger strike to protest and raise awareness about the inhumane conditions they were enduring.[5]  Absent trust that information about their lived experience is not kept in the dark, people detained at GSA and other facilities will continue to believe that the cost for public awareness is their well-being.

Finally, failure to expedite release of the documents sought in the request will embolden GEO to repeat its misconduct with impunity.  Months have passed since the raid, and GEO has faced no apparent repercussions.  The April 15 raid and its aftermath littered GEO's already-soiled record with violations of ICE's Performance Based Detention Standards ("PBNDS") to which the company is contractually bound.[6]  As just a sample of the PBNDS violations that occurred, GEO's employees: used unnecessary and unreasonable punitive force on the then-sleeping/compliant residents of A4; indiscriminately deployed canisters of pepper spray.  *See* Exhibit C at 2-12.  Without speedy public access to the documentation, especially the audio and video footage of April 15, the threat of physical injury to people detained at GSA at the hands of GEO employees is imminent.  That looming threat, moreover, will have an in terrorem effect on expression meant to call attention to the inadequate conditions at the facility.

## B. LCCRSF has an urgent need to inform the public about what happened during and after the A4 Raid.

As explained in the Request, LCCRSF is a 501(1)(c)(3) nonprofit that fights for fair treatment underserved populations through public education, impact litigation, and policy advocacy.  As just one example, LCCRSF published a report in March 2019 about how car towing fees imposed by California local governments inflicted detrimental impacts on impoverished people and municipal budgets.[7]  Using the data and analysis provided in the report, the California legislature introduced a bill to change these policies at the state level in February 2023[8], which passed a few months later.[9]  LCCRSF has also utilized information produced in response to FOIA requests to seek accountability for immigrant families who suffered under the Family Separation

---

*de detencion del Valle Central*, Telemundo, https://www.telemundoareadelabahia.com/noticias/local/san-francisco-protestas-inmigrantes-centros-detencion/2406869/ (July 31, 2024).
[4] *Happening Now: MV-GSA Labor & Hunger Strike*, https://sites.google.com/ccijustice.org/mv-gsa-resistance/home.
[5] *Press Release: Seventy-seven Detained Immigrants Launch Hunger Strike at Two Central Valley Facilities, Protest Unpaid Labor and Inhumane Conditions*, https://www.aclunc.org/news/seventy-seven-detained-immigrants- launch-hunger-strike-two-central-valley-facilities-protest.
[6] *See Ahn v. GEO Group, Inc.*, No. 1:22cv-00586-CDB, at 64-1 p.2 (N.D. Cal. July 21, 2023).
[7] *See Towed Into Debt: How Towing Practices in California Punish Poor People*, https://lccrsf.org/wp-content/uploads/2019/03/WES459_TowReport_A9_Endnotes-1.pdf.
[8] AB 925, introduced into California Senate Committee on Public Safety (February 14, 2023), https://spsf.senate.ca.gov/sites/spsf.senate.ca.gov/files/ab_925_analysis.pdf.
[9] *See* https://leginfo.legislature.ca.gov/faces/billStatusClient.xhtml?bill_id=202320240AB925.

Policy in 2018, which sought to deter migration by separating parents from their children.[10] LCCRSF uses information dissemination, like that sought by the Request, to participate in the democratic process and to balance the scales of power with large government agencies. And the scale of abuse and injury that occurred during the April 15 raid demands exactly the type of public dialog and accountability that LCCRSF can facilitate.

The recent history of GSA alone demonstrates the pressing need for publicizing evidence of the April 15 raid and its aftermath. In just the past three years, GSA has been the subject of complaints from nonprofit organizations to the DHS Office of Civil Rights and Civil Liberties, including about dangerous exposure of vulnerable detained people to COVID-19, rotten food, unsanitary conditions, the use of solitary confinement, and retaliation for protests to inadequate wages for detained people's labor in the facility.[11] In 2022, 16 members of Congress issued a public letter to DHS and ICE about "disturbing conditions and abusive and retaliatory behavior" committed against people detained at Golden State, as well as the "dangerous health risks throughout the facility."[12] That same year, the California Occupational Safety and Health Administration ("Cal/OSHA") investigated, cited, and fined GEO for numerous workplace violations at Golden State.[13] In 2023, the DHS Office of Inspector General ("OIG") published a report finding that the facility was partially responsible for the misuse of $25.3 million dollars of taxpayer money for empty bed space.[14] The patterns of misconduct at GSA call for more, not less, public insight into the facility, such as through the expedited release of records like those sought by the Request.

---

[10] *See, e.g.*, *Wilbur P.G. v. United States*, No. 4:21-cv-04457 (N.D. Cal.) at Dkt. 1; *I.T. v. United States*, No. 4:22-cv-05333 (N.D. Cal.) at Dkt. 1; *J.C.O.C. v. United States*, 3:23-cv-05268 (N.D. Cal.) at Dkt. 1.

[11] Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties from California Collaborative for Immigrant Justice, et al. (Aug. 26, 2021), https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf; Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties from Centro Legal de la Raza, et al. (Sept. 13, 2022), https://www.aclunc.org/sites/default/files/Mesa%20Verde%20-%20Golden%20State%20CRCL%20Complaint_09.22.pdf.

[12] Letter from Members of Congress of the United States to Alejandro Mayorkas, Sec'y, U.S. Dep't of Homeland Security, and Tae Johnson, Acting Dir., U.S. Immigration and Customs Enforcement (Sept. 14, 2022), https://7330553c-3dac-4189-926d9d7bbfbf56ea.usrfiles.com/ugd/733055_1506e41723c045b0a3924140f1268b56.pdf.

[13] *See* U.S. Dept. of Labor, Occupational Safety and Health Admin., Inspection No. 1609228.015, Inspection Detail, https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1609228.015 (last visited Aug. 12, 2024).

[14] U.S. Dep't of Homeland Security, Office of Inspector General, OIG-24-23, Results of an Unannounced Inspection of ICE's Golden State Annex in McFarland, California (2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-04/OIG-24-23-Apr24.pdf.

**C. Without expedited processing, the A4 Raid survivors are deprived of evidence to support claims of substantive due process violations that may entitle them to release from detention.**

The "Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Due Process Clause prohibits civil detention that is punitive in purpose or in effect. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (nature and duration of confinement must "bear some reasonable relation" to its purpose). Civil detention that has a non-punitive purpose may nevertheless be unconstitutionally punitive if it is "'excessive in relation to [its non-punitive] purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]'" *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (internal citations omitted). To remedy unconstitutional civil detention, federal courts may order that ICE release detained people. *See United States v. Torres*, 995 F.3d 695, 709-10 (9th Cir. 2021) ("at some point [civil] detention can become excessively prolonged, and therefore punitive, resulting in a due process violation."); *Doe v. Becerra*, No. 23-CV-04767-PCP, 2024 WL 2340779, at *6-15 (N.D. Cal. May 2, 2024).

The people who survived the April 15 raid, as with all people in civil immigration custody, have the right to petition a federal judge to review their conditions of confinement, and to release them should they be the victims of unconstitutional detention. As explained above, statements made by GEO officers show that the raid's purpose was possibly punitive. *See supra*, Section A. Also, a court could deem the sheer force and fallout of the raid itself to be unconstitutional. Without evidence to substantiate the eye-witness accounts, the April 15 raid victims could be deprived of the opportunity to successfully seek release or a bond hearing to review whether their continued detention is lawful. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690. Expedited processing will ensure that people who suffered the raid can protect their most essential due process right.

*****

For all the reasons above, LCCRSF respectfully urges your office to reverse the denial of expedited processing of the full Request for records. The request meets at least three of the four bases for expedited processing as provided by 6 C.F.R. § 5.5(e)(1). Furthermore, ICE has not complied with the time limits imposed by 5 U.S.C. § 552(a)(6)(A)-(B) to respond to the Request. The 30-day time limit "commence[d] on the date on which the request [was] first received", 5 U.S.C. § 552(a)(6)(A)(ii), on June 26, 2024, making the deadline for ICE's response August 8, 2024. Therefore, in addition to a grant of expedited processing, LCCRSF hereby demands a substantive response to the specific requests for records.

Please provide the applicable records to:

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

Email: vpetty@lccrsf.org
Phone: 415-543-9444

Thank you, in advance, for your prompt attention to this request.

Victoria C. Petty

# EXHIBIT A



June 26, 2024

**SENT VIA EMAIL (ICE-FOIA@ICE.DHS.GOV)**

U.S. Immigration and Customs Enforcement ("ICE")
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

Re:    **FOIA Request**

      The Lawyers' Committee for Civil Rights of the San Francisco Bay Area ("LCCRSF" or "Requester") submits this letter as a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*.  Requester seeks a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k), and expedited processing, pursuant to 6 C.F.R. § 5.5(d) and 5 U.S.C. § 552(a)(6)(E).  Requester's entitlement to the fee waiver and expedited processing are set out in detail following the request for information.

## I.    REQUEST FOR INFORMATION

      Requester seeks all records[1] listed below in the possession or control of the U.S. Immigration & Customs Enforcement (ICE)[2].  All specific requests for information relate to Golden State Annex, the facility with which ICE contracts to detain noncitizens, located at 611 Frontage Road, McFarland, California 93250.  ICE retains and exercises legal custody over individuals detained at GSA.  GEO Group, Inc. ("GEO"), a private corporation, merely operates GSA at ICE's behest in exchange for compensation.  As such, any document within GEO's possession relating to the operation of GSA and detention of noncitizens is plainly within ICE's control.  *See, e.g., Ahn v. GEO Group, Inc.*, 1:22-cv-00586-CDB, ECF 64-1 at 466 (E.D. Cal)

---

[1] The term "records" as used herein includes, but is not limited to: communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications and/or videotapes, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations

[2] The term "ICE" as used herein means ICE headquarters offices, including any divisions, subdivisions or sections therein; ICE's San Francisco Field Office; and/or any other ICE organizational structures that have possession, custody, and/or control over the requested information.

("The Contractor shall safeguard all records related to the operation of the facility.  All records will remain the property of the U.S. Government.").  Requester asks that ICE produce all records within the scope of the specific requests, even if ICE must first obtain those records from GEO. This is an ongoing FOIA request, such that any records that come within ICE's possession prior to a final response to this FOIA request are within the request's scope.

The requested records include:

1) All records related to any and all complaints[3] made by any detained individual housed in GSA Housing Unit A4[4] on any day on or between January 1, 2024 to June 1, 2024, about access to basic necessities, including, but not limited to, toilet paper, water, toothpaste, cleaning equipment, indoor temperature control, recreation, batteries, and food, for individuals currently in the dorm and on behalf of individuals in solitary confinement.

2) All records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024.

3) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4.

4) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the exterior of Housing Unit A4, including, but not limited to the surrounding hallways, doors, and windows.

5) All audio and/or video files including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59am April 8, 2024 to 12:01am April 16, 2024, that capture any detained individual who was then-presently assigned to Housing Unit A4 at any time during the specified date range.

6) All relevant policies and procedures for retaining audio and/or video files and records sufficient to show compliance/noncompliance therewith.

7) All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.

8) All documents related to any search for contraband, or any other prohibited item, that was planned for or actually conducted between 11:59pm April 1, 2024 to 12:01am April 16, 2024, including, but not limited to:

---

[3] ICE should construe any request that uses the term "complaint" to refer to formal grievances (whether provided in writing or electronically through the facility's tablets), verbal complaints or notifications made by detained people to GEO staff and/or ICE, reports made to ICE including to the Office of the Immigration Detention Ombudsmen from detained people or GEO staff, and any other form of notice communicated by a detained individuals.

[4] ICE should construe any request that uses the term "Housing Unit" to include records that contain similar terms, including, but not limited to "dormitory," "dorm," or simply the letter and number combination that is assigned to the location where groups of detained individuals are housed inside of the facility.

     a.  Any investigations conducted prior to any search for contraband, and

     b.  Records sufficient to identify the basis or bases for the search of Housing Unit A4

     c.  Records sufficient to identify the basis for searching the body or belongings of any individuals housed in Housing Unit A4

     d.  Any communications regarding any planned or conducted search for contraband.

9) Records sufficient to show all equipment utilized to conduct any search for contraband that was planned for or actually conducted between 11:59am April 14, 2024 to 12:01am April 16, 2024, including but not limited to restraint devices, impact weapons, batons, oleoresin capsicum spray,[5] chemical agents, tactical gear, and personal protection equipment.

10) Records sufficient to show the personnel involved in the planning and/or execution of any search for contraband that was planned for or actually conducted between 11:59pm April 15, 2024 to 12:01am April 16, 2024, including, but not limited to:

     a.  The rank, position, or title of the individuals involved in any phase of a contraband search;

     b.  The number of individuals involved in any phase of a contraband search; and

     c.  The rank, position, or title of any ICE employee who received notice of a contraband search at any stage.

11) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process.

12) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for conducting searches of detained individuals, including, but not limited to, pat downs, strip searches, cavity searches, and visual inspections.

13) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling personal property owned by individuals detained at the facility.

14) All records related to reports of lost or damaged personal property made on or between April 14, 2024 to June 1, 2024, by any individual who was assigned to GSA Housing Unit A4 on any day during that period, including but not limited to:

     a.  Forms I-387 Report of Detainees Missing Property;

     b.  Reports, oral or written, of allegations of staff mishandling of personal property owned by detained persons; and

     c.  Requests, oral or written, for reimbursement of commissary.

15) All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

---

[5] ICE should construe any request that uses the term "oleoresin capsicum spray" to include records that contain similar terms, including, but not limited to "OC spray," "pepper spray," "mace," or any other similar term.

16) Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property.

17) Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

   a. Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;

   b. Procedures for handling cellular devices confiscated from detained individuals.

18) All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to,

   a. Forms G1025 submitted by GSA to ICE; and

   b. Records of investigation conducted by ICE.

Any records that exist in electronic form should be provided in their native electronic format on a compact disc, digital videodisk, or equivalent electronic medium. Any documents stored in Portable Document Format ("PDFs") should be provided as individual files in a searchable PDF format. Any records produced in PDF, TIFF, or other image formats must be produced in full, uncompressed form; do not compress images or alter the resolution, as this interferes with their legibility. Finally, Requester asks that ICE transmit reasonable metadata along with files, including but not limited to maintaining parent-child relationships between emails and their attachments, author information, as well as date and time stamp information. To facilitate a speedy response, Requester asks that records responsive to this request be produced on a rolling basis.

All requested records that are responsive may be provided with personally identifying details redacted according to 5 U.S.C. § 552(b)(6). Requester expects the release of all segregable portions of otherwise exempt material.

If, under applicable law, any of the information requested is considered exempt, please describe in detail the nature of the information withheld, the specific exemption or privilege upon which the information is withheld, and whether the portions of withheld documents containing non-exempt or non-privileged information have been provided.

## II.   REQUEST FOR EXPEDITED PROCESSING

Requester seeks expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). Expedited processing is appropriate, under 6 C.F.R. § 5.5(e)(1), because this FOIA request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information" and "[a] matter of widespread and

exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

LCCRSF is a nonprofit entity under Section 501(c)(3) of the Internal Revenue Code. Dedicated to ensuring civil rights protections and access to justice for all immigrants, refugees, and asylum seekers, LCCRSF provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. LCCRSF's primary purpose in making this FOIA request is to inform the legal community and the public, specifically in California, about the detention of noncitizens at GSA. Providing the requested information on an expedited basis is justified because the information will contribute to public understanding of current practices at GSA, as well as identifying potential grounds for seeking adjustment to such practices. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (ordering expedited processing where information dissemination is an "activity of the requestor" even if not its "sole occupation"); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing for an organization that "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by the Department of Justice").

### III.  REQUEST FOR WAIVER OF FEES

LCCRSF is also eligible for waiver of any fees associated with this FOIA request. Such a waiver is warranted because disclosure of the information is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge or at a reduced rate if the information is in the public interest, and disclosure is not in commercial interest of institution). In addition, LCCRSF can widely disseminate the requested information to its networks of immigrants' rights organizations and to the public. *See Judicial Watch v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) (finding a fee waiver appropriate when the requester explained how and to whom it would disseminate the information it received).

As described above, LCCRSF is a non-profit organization committed to increasing public understanding of immigration law and policy, advocating for the fair and just administration of civil rights laws, and protecting the legal rights of noncitizens and citizens alike. LCCRSF utilizes information it receives in response to public records requests to increase community awareness of matters of public concern. *See, e.g.*, *Civil Assessments: The Hidden Court Fee That Penalizes Poverty*, https://lccrsf.org/wp-content/uploads/2022/03/Civil-Assessments-Report-FINAL.pdf; *Cited for Being in Plain Sight: How California Polices Being Black, Brown, and Unhoused in Public*, https://lccrsf.org/wpcontent/uploads/LCCR_CA_Infraction_report_ 4WEB-1.pdf. The purpose of this request is not commercial gain, rather as a not-for-profit organization, Requester seeks the information to execute its commitments and obligations to the public.

****

Please provide the applicable records to:

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

Email: vpetty@lccrsf.org
Phone: 415-543-9444

Thank you, in advance, for your prompt attention to this request.

_____

Victoria C. Petty

# EXHIBIT B

## ICE FOIA 2024–ICFO–43541 Amended Acknowledgement

ice-foia@ice.dhs.gov <noreply@securerelease.us>

Thu 7/25/2024 9:02 AM

To:Victoria Petty <vpetty@lccrsf.org>

07/25/2024

Victoria  Petty
131 Steuart St #400
San Francisco, California 94105

RE:  ICE FOIA Case Number 2024-ICFO-43541

Dear Requester:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated 6/26/2024, your request for a waiver of all assessable FOIA fees, and your request for expedited treatment. Your request was received in this office on 6/26/2024. Specifically, you have requested  records related to any and all complaints3 made by any detained individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B). If you're able to narrow the scope of your request please contact our office. Narrowing the scope may speed up the search process. We will make every effort to comply with your request in a timely manner.

ICE evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations.  These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met.  I have considered the following factors in my evaluation of your request for a fee waiver:

(1) Whether the subject of the requested records concerns "the operations or activities of the government";
(2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;
(3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;
(4) Whether the contribution to public understanding of government operations or

activities will be "significant";

           (5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and

           (6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have determined to grant your request for a fee waiver.

Your request for expedited treatment is hereby denied.

Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(e)(l)(ii). Requesters seeking expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct. 6 C.F.R. § 5.5(e)(3).

Your request for expedited processing is denied because you do not qualify for either category under 6 C.F.R. § 5.5(e)(1). You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally. Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards.

If you deem the decision to deny expedited treatment of your request an adverse determination, you have the right to appeal. Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.5(e)(2). You may submit your appeal electronically at GILDFOIAAppeals@ice.dhs.gov or via regular mail to:

           U.S. Immigration and Customs Enforcement
           Office of the Principal Legal Advisor
           U.S. Department of Homeland Security
           500 12th Street,, S.W., Mail Stop 5900
           Washington, D.C. 20536-5900

Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

ICE has queried the appropriate program offices within ICE for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions please contact FOIA Public Liaison Daniel Edgington, at (866) 633-1182 or 500 12th St, SW Stop 5009 Washington, DC 20536-5009. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. You may contact OGIS as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned reference number 2024-ICFO-43541. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

# EXHIBIT C

  

August 15, 2024

*via Email*

Shoba Sivaprasad Wadhia, Officer
*CRCLCompliance@hq.dhs.gov*
Office for Civil Rights and Civil Liberties
Compliance Branch
U.S. Department of Homeland Security

Joseph V. Cuffari, Inspector General
*DHS-OIG.OfficePublicAffairs@oig.dhs.gov*
Office of the Inspector General
U.S. Department of Homeland Security

Michelle Brané, Immigration Detention Ombudsman
*OIDOPolicy@hq.dhs.gov*
Office of the Immigration Detention Ombudsman
U.S. Department of Homeland Security

**Re:    EXCESSIVE USE OF FORCE, RETALIATORY DRAGNET SEARCHES, AND OTHER ABUSES AGAINST PEOPLE DETAINED AT GOLDEN STATE ANNEX ICE DETENTION FACILITY ON AND AFTER APRIL 15**

Dear Officer Wadhia, Inspector General Cuffari, and Ombudsman Brané:

The undersigned organizations submit this complaint on behalf of people currently or previously detained at Golden State Annex ICE Detention Facility ("Golden State"), who seek redress for the violent raid committed and/or sanctioned by Immigration and Customs Enforcement ("ICE") and its for-profit contractor, the GEO Group ("GEO"), at the A4 dormitory at Golden State on and after April 15, 2024 ("A4 Raid").[1] What happened that day, as recounted in Section I, followed a series of documented abuses at Golden State, as described in Section II, and requires the immediate action outlined in Section III.

---

[1] Out of fear of further retaliation for speaking out, the aggrieved individuals have chosen to keep their identities anonymous. All facts detailed in this complaint, unless otherwise noted, are based on interviews conducted with 20 people who were detained in dormitory A4 of Golden State on April 15. The undersigned authors conducted these interviews in June and July of this year, and will provide your offices with signed privacy waivers (on ICE Form 60-001) upon request.

I. **On April 15, 2024, dozens of masked officers at Golden State physically and psychologically assaulted an entire dormitory of detained people.**

Days before April 15, the people in dormitory A4 at Golden State engaged in two sit-ins organized by four individuals–all four of whom would later be assaulted, handcuffed and placed in solitary confinement on April 15. During the sit-ins, both of which lasted a couple of hours, the four organizers communicated the dorm's collective needs to GEO officers. The collective needs included: toilet paper; ice and cold water to cope with the soaring temperatures; adequate cleaning supplies; and redress for a dormmate who recently had been placed in solitary confinement. The sit-ins ended after Golden State's Facility Administrator, Minga Wofford, assured the people of A4 that their concerns would be resolved.

During the early hours of April 15, officers covered every window of A4 from the outside. Dozens of officers gathered by the dorm's front and rear entrances before swarming in, fully geared in black with helmets and masks, holding shields in one hand and tanks of pepper spray in the other. Although most of the dorm lay asleep, officers commanded that "everyone get the fuck down on the floor!" Around a dozen officers bombarded the bunk areas where the four organizers of the sit-ins slept. The four complied with officers' demands to stand, be handcuffed, and exit the dormitory. As they walked out, they heard the screams of their dormmates behind them.

Over the course of the A4 Raid, officers indiscriminately sprayed chemical agents, beat restrained and compliant people, and destroyed personal property. After the raid, they unjustifiably confined people in solitary cells and deprived people of medical care for injuries suffered during the raid and basic necessities like medication.

A. **Officers used brutal force, including punching people and indiscriminately using pepper spray.**

The contract authorizing GEO to operate Golden State on ICE's behalf requires that the facility comply with several detention standards, including the Performance-Based National Detention Standards ("PBNDS").[2] Under the PBNDS, the use of force is authorized only when "both necessary and reasonable,"[3] and only "to the minimum extent necessary to restore order, protect safety and provide security[4] . . . after all reasonable efforts to otherwise resolve a situation have failed,"[5] such as through "first gain[ing] detainee cooperation."[6] Certain actions are generally prohibited unless "both necessary and reasonable,"[7] such as "using force against a detainee offering no resistance."[8] In addition, the PBNDS requires that, "confrontation avoidance . . . [shall] always . . . be attempted prior to any calculated use of force."[9]

---

[2] *See* Reply by United States to Mot. to Dismiss, *Ahn v. GEO Group, Inc.*, No. 1:22cv-00586-CDB, at 64-1 p.2 (N.D. Cal. July 21, 2023).
[3] U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011 (2016) [hereinafter PBNDS], § 2.15(I).
[4] *Id*. § 2.15(II)(3).
[5] *Id*. § 2.15(I).
[6] *Id*. § 2.15(V)(A)(1).
[7] *Id*. § 2.15(V)(E).
[8] *Id*.
[9] PBNDS § 2.15(II)(2).

It is clear that these standards were violated on April 15, 2024. On information and belief, officers[10] chose to conduct the raid in the early morning hours, when they knew that most people in the dorm were still asleep. Instead of quietly approaching their targets to maintain calm, officers entered the dorm shouting expletives, and used violence from the outset. They woke sleeping individuals by shoving, pushing, and manhandling them out of their beds. As people were being woken up, officers physically assaulted or aggressively restrained people who were not resisting. Moreover, officers disseminated clouds of pepper spray almost immediately upon entry and did so indiscriminately. Indeed, the details of these accounts make clear that officers never attempted to avoid confrontation and comply with the PBNDS.

**Physical assaults.** "[S]triking a detainee" is explicitly prohibited under the PBNDS unless doing so is "both necessary and reasonable" and only if "grasping or pushing him/her" would not be an effective means of maintaining control.[11] Throughout the raid, officers used force that cannot be described as necessary and reasonable[12] especially when interacting with compliant and/or restrained individuals. The officers ignored people who repeatedly expressed aloud that they were willing to comply with orders, assaulting them regardless. For example, one of the organizers of the sit-ins was still in a daze when he was awakened by officers by being dragged out of bed and handcuffed. Even when he expressed his willingness to comply, the officers grabbed him by the elbows and dragged him out of the room.

Officers also attacked multiple individuals despite having already restrained them using zip-ties or handcuffs. Another organizer of the sit-ins was roused by officers and immediately began complying, allowing himself to be handcuffed and dragged out of the dorm. However, just outside the dormitory in a hallway, an officer punched the organizer in the face. A third organizer shared that after waking up from the noise and chaos of the situation and while attempting to put on his shoes, Officer Gant grabbed and twisted his arm at the shoulder, before handcuffing him and forcing him down. Despite the person's verbal indications that he would not resist, Officer Gant continued to twist his shoulder and refused to let him go. As described further below,[13] this person's resulting physical injury persists.

Similarly, another person in the dorm reported that after voluntarily putting his hands behind his back to submit to handcuffing, four officers tackled him to the ground before zip-tying him, which bruised his arms, testicles, pelvis, and legs. Later, when he was strip-searched,[14] officers cut his clothes with scissors, even after he volunteered to remove them himself. Another detained person  reported that he was pushed to the ground by three officers who pulled back his shoulders and forced his legs toward his back, scraping his leg and causing swelling in his foot in the process.

More broadly, multiple people reported seeing officers beat individuals who were already on the ground. For example, two witnesses saw Officer Ramos punch in the face and pepper spray a trafficking survivor in his early 20s, busting the detained person's lips in the process. After this person was on the ground, Officer Ramos handcuffed him, pepper sprayed him again,

---

[10] Detained people recognized some of the officers conducting the raid as GEO staff, and noted that some were unidentifiable. At least one detained person who was previously detained at Mesa Verde recognized one of the officers as a GEO employee who regularly worked at Mesa Verde.
[11] PBNDS § 2.15(V)(E)(1).
[12] *See id.* § 2.15(V)(E).
[13] *Infra*, Section I(B).
[14] *See generally*, *infra*, Section I(C).

then punched him again, this time at the side of the jaw. This individual later withdrew his applications for deportation relief and accepted a removal order, partly because of this experience.[15] In another instance, a witness described seeing one person held down by four officers, including one who had his full weight on the person's upper torso and face, which was planted into the ground.

These examples of physical assault show that Golden State used indiscriminate and wanton levels of force in direct violation of the PBNDS "necessary and reasonable" standard, as well as its prohibition on the use of force against detained individuals who do not resist.[16] Moreover, it is unclear how the officers were restoring order, whose safety they were protecting, or to whom they were providing security[17] by acting in this way. The detained individuals expressed a desire to cooperate that the officers abjectly ignored, which is the first step required by the PBNDS before authorizing the use of force.[18] Thus, officers failed to maintain the use of force at a "minimum extent" throughout the raid.[19]

**Chemical agents.** The people of A4 confirmed that officers used pepper spray throughout the raid. The use of pepper spray, which is an intermediate force weapon,[20] can be authorized only if detained people are "armed and/or barricaded, or cannot be approached without danger to self or others; and a delay in controlling the situation would seriously endanger the detainee[s] or others, or would result in a major disturbance."[21]

There was no reason for officers to believe that the people of A4 were armed, barricaded, or dangerous. From all accounts, the only "major disturbance" at the time was the raid itself – conducted by officers dressed in SWAT-like attire and shouting expletives on unsuspecting, sleeping individuals. In fact, multiple detained individuals reported being violently roused and dragged out of their beds, as described immediately above, or being pepper sprayed without provocation. One person reported waking up to a pepper spray tank being pointed in his face, so close that the chemical residue on the tank got in his eye and burned him. Yet another person stated that he was suddenly sprayed right as he sat up in bed. Another witnessed Lieutenant Garza pepper spray a detained person who was verbally attempting to deescalate the situation as he watched officers physically take down his dormmate.

Officers were seen using large, oxygen tank-like containers to dispense the pepper spray in every direction. The use of pepper spray occurred for an extended period – one person who was about 11 feet away from the officers when sprayed witnessed multiple officers spraying more than once, for about five seconds with each spray, for about five to 10 minutes. Because of the quantity of chemicals used, the effects of the pepper spray – including eye irritation, labored breathing, and skin rashes – continued long after the initial deployment. As a result of the contamination, no one was allowed to return to the dorm for several days. Instead, those who

---

[15] Undersigned authors also spoke with the deported person's attorney, who confirmed that their client described being assaulted by officers on April 15 and withdrew his applications for deportation relief in part because of the assault. The attorney has been unable to make contact with their client since his deportation.
[16] PBNDS § 2.15(I).
[17] *See id.* § 2.15(II)(A)(3).
[18] *See id.* § 2.15(V)(A)(1).
[19] *See id.* § 2.15(II)(3).
[20] *Id.* § 2.15(V)(G)(4)(a).
[21] *Id.* § 2.15(V)(G)(3)(a-c).

were not sent to solitary confinement were temporarily confined in a different dorm, resulting in them being separated from their property.[22]

The pepper spray exacerbated the panic, injury, and chaos created by the raid. Instead of using the pepper spray to bring a tumultuous situation under control, officers themselves "seriously endanger[ed]" the detained individuals.[23] In fact, one individual who has documented anxiety and panic-related disorders reported that he "woke up in a panic" due to the sounds of the raid, saw an officer pointing something at him, and grabbed his property box (a plastic box approximately one square foot) and threw it on the floor in his panic and fear. He was pepper sprayed immediately, and then physically assaulted by multiple officers in a hallway.[24]

Because the only danger that day was caused by the entry of the officers into the sleeping quarters and their unjustified aggression, there was no justification for the officers' indiscriminate use of pepper spray.

**Restraint devices.** Under the PBNDS, restraints may only be applied "for the least amount of time necessary," and only when preventing escape during transfer, for medical reasons, or to prevent injury.[25] Nonetheless, officers zip-tied or handcuffed at least six individuals, most of whom were complying with the officers' demands. One individual who, after indicating his willingness to cooperate with the officers, spent 30 minutes in handcuffs, shared that because officers are not properly trained on how to apply handcuffs, their rough handling resulted in cuts on both wrists. Another reported that he was left alone in a room, with his arms tied behind his back, from approximately 10 a.m. until 7:30 p.m. due to false allegations that he threw some of his property during the raid.[26] And as described further below, one person was left handcuffed, in a locked solitary cell without running water, for almost twelve hours.[27]

**Use of force as punishment.** When later asked, Lieutenant Garza informed a detained person that the A4 Raid was conducted to stop the dorm from "doing too much," as it already had by "staying in the hallway" and "pushing and pushing" for basic necessities. Lieutenant Garza complained that every time A4 engaged in protest, the officers "have to make a report and [they] keep looking bad." The Lieutenant also informed another detained person that the raid was conducted at ICE's behest. At least three other individuals were informed by GEO officers that the raid was conducted specifically to target the four organizers.

The PBNDS warns that force "is never used as punishment."[28] However, the manner in which the officers executed the raid, the lack of any attempt to conduct a contraband search in a less aggressive manner, and Lieutenant Garza's statements indicate that the force inflicted on the people of A4 was indeed intended as punishment for communicating their needs.

**B. Golden State failed to provide timely and adequate medical care after using force.**

Under the PBNDS, supervisors must obtain "pre-authorization and [consult] with medical staff to determine if the detainee[s have] medical issues requiring specific precautions" before

---

[22] *See infra*, Section I(D).
[23] *See* PBNDS § 2.15(V)(G)(3)(c).
[24] Notably, this person never received a disciplinary write up for throwing his property box.
[25] PBNDS § 2.15(V)(B)(1).
[26] Notably, this person never received a disciplinary write up for throwing property.
[27] *Infra*, Section I(F).
[28] PBNDS § 2.15(V)(A)(1).

enacting a calculated use of force.[29] Furthermore, prior to the use of intermediate force weapons, like pepper spray, staff is required to consult medical staff to review a detainee's medical file for "a disease or condition that an intermediate force weapon could seriously exacerbate."[30] Finally, a supervisor must, "whenever possible, arrange for a health services professional to be present to observe and immediately treat any injuries" during a calculated use of force.[31]

Golden State utterly failed to consider people's preexisting conditions, which were predictably and seriously exacerbated by the officers' actions. The undersigned authors are aware of at least five individuals who have had a documented history of paranoia, anxiety, PTSD, and/or panic attacks who were prescribed related medication during the time of the raid. One person's medical records reflected: diagnoses of panic disorder, PTSD, and Bipolar Disorder; two prior suicide attempts, one by hanging and another by medication overdose; endorsement of auditory hallucinations, daily nightmares, and anxiety; and placement on suicide watch during his detention at Golden State. These detained individuals were particularly susceptible to injury resulting from use of chemical agents and from the alarm of a full force early morning raid.

Nor did there appear to be a medical professional present, or even on standby, to immediately treat injuries.[32] In fact, immediately after the raid, officers failed to provide and in some instances actively denied individuals any tools to help mitigate the effects of the pepper spray. Instead, injured people were forced to find their own means of alleviating the effects, for instance, by throwing milk on their faces or using dirty laundry to cover their faces.

Officers also denied immediate medical attention to those who suffered injuries from the physical attacks. One person who was tackled by four officers, resulting in bruises to his arms, testicles, pelvis, and legs, did not see a medical professional until the following day. Another person, whose medical records documented prior suicide attempts and who was attacked by officers, did see a medical professional sometime on April 15 but reported that the care was insufficient to address his needs. Despite physically "shivering" with severe pain to his right injured leg, a nurse saw this person for just a few minutes, told him he had "shock symptoms," and simply offered ibuprofen. The undersigned authors reviewed his medical records from that day, and they fail to mention the use of pepper spray or *any* assessment of mental health needs. As the person explained:

> After I was tackled, I was taken to a private room and remained there for several minutes. I was shaking, I was scared, the chemical made me tremble because of the pain . . . After [going to] medical, they took me back to a private room and I stayed there for several hours. I was still in so much pain. I had suicidal ideations because I was in so much pain. I kept saying "why me" and I wanted to kill myself. I felt like I was burning alive. Then they allowed me to go to the shower to wash the chemicals off. Then they returned me to my room. It was a day full of panic attacks.

In fact, the vast majority of people with whom the undersigned authors spoke reported worsened mental health as a direct result of the raid, including increased anxiety and depression, difficulty sleeping and increased nightmares/flashbacks, fear and tension around GEO and ICE

---

[29] *Id.* § 2.15(V)(B)(15).
[30] *Id.* § 2.15(V)(G)(3).
[31] *Id.* § 2.15(V)(I)(3)(d)(3).
[32] *Id.* § 2.15(V)(I)(3)(d)(3).

officers, and other PTSD-like symptoms. Raid survivors recounted the following during interviews with undersigned authors:

> I take psych meds. This incident made my anxiety and depression worse . . . Since the raid, when GEO officers enter our dorm, I look at them and wait to see if something is going to happen. Other people in my dorm feel the same way. We're on edge. I have flashbacks about that day.

> I have intense panic when I see officers enter the [dorm]. I go to my bed and don't look towards the officers . . . I begin to tremble [and] I have nightmares of that incident. This does enter my mind frequently and I wonder why they did it . . . I wonder to myself "Is it going to happen again?" . . . When I have to go to my psych visit or to medical, I become panicked because I know I'm going to have to interact with the officers.

> It's hard for me to fall asleep now. I keep thinking they're going to show up with force again. When the officers enter the dorm . . . I feel like I have to watch my back from them. I think about that day often. I have flashbacks of them spraying us and seeing everyone confused.

> I'm on [psychiatric] meds now, and I never had to be . . . I've been experiencing insomnia . . . there are nights I can't even go to sleep. I'm paranoid now. I can't see more than 2-3 officers at the same time because I'm afraid they're gonna get me.

> I have PTSD after that day . . . I can't sleep at night . . . I feel tense and shaky. All throughout the day I feel that way . . . I think about that day often without wanting to.

> Even now I'll be on the phone and I'll hear the front door slam and I get paranoid and think they're coming again. My body tenses up and I get in defense mode, like I'm just waiting for it.

> [During the raid] I was not able to communicate with my family. It was stressful and it became difficult for me to sleep and eat. Eating caused nausea and it hurt to eat. My head hurt as well. When many officers enter the dorm, one now thinks that the same thing will happen again.

> We are humans, I don't understand why they treated us that way. It drains your body, your mind, it's hard to be in a place where it's so full of tension. We don't have control over anything in there. Your body just feels tight. Pushing paperwork doesn't take away the experience that we went through.

At least one person, whose shoulder was pulled by an officer during his arrest, continues to experience physical injuries, including severe daily pain that disrupts his sleep, and now requires physical therapy. Moreover, two individuals reported that they did not seek medical attention because of prior experiences with Golden State failing to provide needed care, while at least one stated that he did not seek care out of fear of retaliation–specifically, a fear that he would be perceived as "someone causing problems" and therefore a target for similar attacks.

Thus, considering the severity of officers' physical and psychological assault on the detained individuals, and the facility's history of inadequate medical care and retaliation, Golden State violated the PBNDS by failing to provide timely and adequate medical care.

**C. Officers conducted degrading, invasive, and unnecessary bodily searches.**

Under the PBNDS, all searches must be conducted "without unnecessary force," and "in ways that preserve the dignity of detainees."[33] Body searches must employ "the least intrusive practicable search method . . . as indicated by the type of contraband and the method of suspected introduction or concealment."[34] Strip searches are only authorized if there is "reasonable suspicion," defined as "suspicion based on *specific* and articulable facts that would lead a reasonable officer to believe" that the specific person possesses contraband."[35] All of these standards were violated in the raid's immediate aftermath, as officers moved the majority of the dorm into other areas of Golden State, subjected them to two rounds of bodily searches—initially a pat search and, soon thereafter, a more invasive search wherein groups of guards forced each person to undress down to their underwear.

Multiple individuals reported gratuitous rough treatment and verbal abuse during the searches. After one person questioned the propriety of the more invasive second search, officers tackled the person to the ground and commanded that he "stop resisting," even though he had not been physically resisting at all. The officers then forcefully restrained the person during the ensuing search and cut his clothes off with scissors, even though he had offered to take off his clothes himself. These searches, which – like the earlier pat downs – reportedly did not yield a scrap of contraband, were conducted with unnecessary force and unnecessary intrusiveness, in violation of PBNDS.[36]

The strip searches were also impermissibly conducted as a universal dragnet, without the individualized reasonable suspicion based on "specific and articulable facts" required.[37] In response to a collective grievance submitted by those in A4, GEO dismissed concerns by claiming that none of the searches were strip searches as defined by the PBNDS, because people were not made to fully remove their underwear. However, the PBNDS defines a strip search as involving "the removal or rearrangement of *some* or all of the detainee's clothing,"[38] while a "pat search does not require the detainee to remove clothing."[39] That some people remained in their underwear does not protect Golden State from complying with the PBNDS's strict requirements that strip searches be documented and only performed when there is "reasonable suspicion." And in any case, two people reported that officers pulled at the elastic waistband of their underwear and peered inside, and two others reported actually being forced to remove their underwear completely. Indeed, all signs point to the conclusion that these invasive, traumatizing bodily searches were wielded as a tool for repression and retaliation.

---

[33] PBNDS § 2.10(II)(4).
[34] *Id.* § 2.10(II)(5).
[35] *Id.* § 2.10(B)(D)(2)(b).
[36] *Id.* §§ 2.10(II)(4) & (5).
[37] PBNDS §§ 2.10(II)(7) & (V)(D)(2)(b).
[38] *Id.* (emphasis added)
[39] *Id.* § 2.10(V)(D)(1)(a).

**D. Golden State deprived people of access to essential needs for days after the raid.**

For several days after the raid, Golden State prevented detained people from accessing basic necessities, including medication, exacerbating many people's pre-existing medical conditions such as diabetes, PTSD, anxiety, and depression. Per the PBNDS, Golden State must order, dispense, and administer detained individuals' medications "in a timely manner and as prescribed by a licensed healthcare professional."[40] Even during "lockdowns," "basic detention services" including "medication delivery" must be provided.[41] Golden State violated these PBNDS provisions by failing to provide individuals with their necessary medication during the lockdown that resulted after the raid.

At least five detained individuals who required their prescribed medication reported that the facility refused to give the medication until hours to days later. For instance, when one detained individual with diagnosed anxiety and depression asked for his daily medication, an officer told him that he could not get his medication until four days after the raid. Since the individual could not take any medication to alleviate his symptoms, the trauma of the raid exacerbated his anxiety and depression. Another person did not get his eyeglasses until nearly a week after the raid and remained without his medication for high blood pressure and diabetes for at least three days, despite repeatedly asking officers and medical staff for these items. Consequently, he suffered from headaches and dizziness for several days.

**E. Golden State permanently lost or damaged people's personal property, including sensitive legal documents.**

The PBNDS requires that officers promptly "restore all items as close as possible to their original order" after searches of dormitories.[42] If personal property is lost or damaged, officers are required to "promptly reimburse detainees for all validated property losses caused by facility negligence."[43] During the raid, officers lost and/or destroyed detained people's personal property, including sensitive and necessary legal documents.

People who returned to A4 days after the raid found the dorm in complete disarray. At least six people reported to the undersigned authors that they permanently lost court documents.[44] These documents included those relating to an individual's interview with the Asylum Office, letters and declarations from witnesses, copies of witness identification documents, appeal documents, contact information for and written correspondence with attorneys, and copies of birth certificates. Some reported also missing personal letters from family, family photographs, and contact information for family, all of which are often needed to support defenses to deportation in immigration court.

The destruction or loss of legal documents is particularly harmful because obtaining such paperwork, let alone replacements, is already an often insurmountable burden on detained people

---

[40] *Id.* § 4.3(II)(20).

[41] *See id.* § 2.10(V)(C).

[42] *Id.* § 2.4(V)(F)(3)(a).

[43] *Id.* § 2.5(V)(L)(3).

[44] Although some individuals were able to recover legal documents upon return to the dorm, the chaotic state in which Golden State left their property resulted in people being able to access and read their dormmates sensitive documents. This breach in confidentiality is particularly concerning due to the fact that most immigration defenses requires producing documentation of highly sensitive facts that can further endanger a person, such as evidence of sexual orientation, persecution by specific gangs or groups, or cooperating with law enforcement.

– they cannot call their family members, or oftentimes even their lawyers, for free.[45] And if an individual loses a document essential to their immigration case, they may be delayed in or altogether lose the opportunity to present their claims in court. The loss or destruction of such paperwork thus has the grave consequence of unjust prolonged detention or deportation.

Many people also reported permanently losing items purchased from commissary, including personal hygiene products, food, and clothing, none of which was ever reimbursed. Although some detained persons informed GEO and ICE officials of their missing property and have repeatedly asked the officials whether they would be reimbursed for lost property, Golden State has failed to provide any reimbursements. After filing a claim for his missing immigration legal documents, one individual reported that staff displayed anger and refused to help replace them. Others felt dissuaded from reporting missing property. One individual reported that the Assistant Facility Administrator Scott Frauenheim stated that if he did not file his claim "immediately," it would be regarded with suspicion. Others did not file claims because they felt it would be futile – an assumption later confirmed when those who did file claims never received reimbursement.

## F. The organizers of the protests days before the raid suffered indefinite solitary confinement, continued physical assault, sexual harassment, and unjust disciplinary proceedings.

Under the PBNDS, solitary confinement can only be used in three circumstances: (1) as "administrative segregation," in cases where a detained person "represents an immediate, significant threat to safety, security or good order" and "cause exists and supervisory approval granted"; (2) as "disciplinary segregation," in cases where "a disciplinary hearing panel [finds] that the detainee is guilty of a prohibited act" classified as at least "high-moderate," and that no "alternative disposition" would otherwise "regulate the detainee's behavior"; and (3) to provide "protective custody."[46]

**Administrative segregation.** After storming into the dorm on April 15, around a dozen officers immediately hurried over to the bunks belonging to the four organizers. The organizers were handcuffed, moved out of the dorm by two officers assigned to each person, and physically assaulted. They were then brought to solitary cells, despite there being no showing that they posed any danger to themselves, others, or the facility – indeed, the primary threat that morning came from the officers conducting the raid, as outlined above. In fact, the Incident Reports later provided to the organizers accused them of possessing contraband that was not discovered until a search of A4 that was conducted *after* their arrest. Moreover, none of the organizers had ever previously received an Incident Report indicating any suspicion of contraband until April 16, the day after their arrest.[47]

---

[45] *See Loss of Free Phone Access – A Critical Lifeline in Detention – Triggers Hunger Strikes*, Detention Watch Network, June 13, 2024, https://www.detentionwatchnetwork.org/pressroom/releases/2024/loss-free-phone-access-critical-lifeline-detention-triggers-hunger-strikes; Farida Jhabvala Romero, *ICE Cuts Off Free Calls to Lawyers for Immigrant Detainees in California*, KQED, Aug, 1, 2024, https://www.kqed.org/news/11998413/ice-cuts-off-free-calls-to-lawyers-for-immigrant-detainees-in-california.
[46] PBNDS §§ 2.12(II)(3), (6), & (4).
[47] Under the PBNDS, "[o]fficers who witness a prohibited act, or have reason to suspect one has been committed, shall immediately prepare and submit an Incident Report." *Id.* § 3.1(V)(D).

Officers continued to violate the PBNDS by limiting the organizers' recreation time to just one hour for several days.[48]

**Disciplinary proceedings.** The PBNDS mandates that "[a]ll Incident Reports [] state facts clearly, precisely and concisely, omitting no details that may prove significant."[49] Three of the organizers were accused of having a container of THC substance in their "bed area," while the fourth was accused of having a cell phone. At least one organizer requested clarification on where exactly in his "bed area" the THC container was found but was given no more detail other than that it was simply in his "bed area."[50]

The PBNDS also requires that all evidence "considered or generated in the hearing process" be disclosed, unless disclosure would be either illegal or pose an "imminent threat" to the facility's safety and security.[51] At least two of the organizers requested review of the evidence against them, which included photographs and CCTV footage that would have captured where the contraband was found and who had placed it there. However, they were denied the opportunity to inspect both, the only reason provided being that "this is not a criminal proceeding."[52]

**Prolonged solitary confinement.** Under the PBNDS, a person can only be kept in solitary confinement past completion of a disciplinary sentence if returning the person to the general population would pose a threat to the detained person, or to security and orderly operation of the facility.[53] However, three of the organizers were kept in solitary longer than their prescribed sentences without any such showing, for 8, 22, and 25 additional days respectively. One of the organizers was told by Assistant Facility Administrator Frauenheim that his time in solitary could be extended every week, and that he would be returned to his dormitory if he promised not to "get in our business," to "stop all the protesting and standing up for people," and agreed to "just let us handle what we got to handle." The organizer agreed and was released back to his dorm the same day.

**Sexual harassment and violent assaults.** While in solitary, the four organizers experienced psychological, sexual, and physical harm. At least one organizer experienced recurrent nightmares during this time, and since he has been returned to his dorm, "will space out and just come back to being in the hole."

Another organizer experienced sexual harassment. On at least three different occasions while he lay on his stomach, Officer Vargas suggested that the organizer was positioned that way to allow officers to have anal sex with him. Although the organizer filed complaints and spoke to various officers about the incident, Officer Vargas never appeared to be reprimanded and or even prevented from working in the solitary unit for any period of time. As a result, the organizer was deprived of meals and recreation time, as he was forced to decline both during times when accepting meals or leaving his cell would require further engagement with Officer Vargas.

---

[48] PBNDS §§ (V)(L)(1).
[49] *Id.* § 3.1(V)(D).
[50] When the organizer requested the definition of a "bed area," he was informed that anything within "four to five feet" of a person's bed constitutes their "bed area." The bunkbeds in A4 are each spaced two feet from the beds in front and behind, and four to five feet from the beds on either side. This organizer's "bed area" in particular overlapped with the "bed areas" of at least three other people.
[51] PBNDS § 3.1(II)(16).
[52] Both organizers filed written appeals of the Institution Disciplinary Panel's findings; both appeals were denied.
[53] PBNDS § 2.12(V)(A)(1).

Another organizer also experienced sexual harassment. On various occasions, Officer G. Romo called the organizer a "bitch," stared at the organizer through the cell's window while licking his lips, informed the organizer that his "hair looks cute like that," and blew him kisses. Although initially denied help by other officers in filing a complaint, he eventually was able to make one. It is unknown whether Officer G. Romo received any consequences for his conduct.

This same organizer was also physically assaulted while in solitary confinement. While on hunger strike and after experiencing a deterioration in his mental health symptoms, which include PTSD, the organizer met with the staff psychologist in a small office. During this meeting, a nurse walked in and asked loudly whether the organizer was "still talking shit" such that other officers in the area could hear the question. Out of frustration that his psychiatric care was not kept confidential or respected, the organizer threw a can of Ensure at the wall, resulting in its contents spilling all over the office. Officers immediately entered the room, grabbed his neck, slammed his head against a wall, and handcuffed him. Soon after, over a dozen officers stormed into the unit, stating "I wanna kill this motherfucker," "where the fuck is he at, we're gonna fuck him up right now," and "let's fuck him he's a bitch," among other things. ICE Officer Contreras was present in the room during this entire exchange but did not intervene. The organizer was then placed on "suicide watch," despite his insistence that he was not suicidal, and moved into a cell with no running water and a dirty mattress on the floor. He was handcuffed for approximately twelve hours while inside the locked cell, and informed that if he broke his hunger strike, he would be taken off suicide watch. He agreed to eat, but was not moved out of the dry cell until the next day. After this incident, medical staff stopped monitoring his health regularly; only providers who worked on the evening shift agreed to treat him.

## II.  ICE and GEO have a history of inflicting abuse at Golden State, particularly to quell detained people's protest of harmful conditions.

ICE began confining individuals at Golden State around September 2020. Since then, detained people, community organizations, and government agencies have condemned the facility's inhumane conditions. Facing these expositions, ICE and GEO have not only failed to curb mistreatment, they have doubled down on their abuses.

In August 2021, individuals detained across five ICE detention centers in California filed a complaint with CRCL concerning First Amendment retaliation.[54] The complaint highlighted Golden State's abhorrent conditions, including failure to follow basic COVID-19 safety protocols; deprivation of adequate and timely medical and dental care; spoiled food[55]; unsanitary conditions; and the mis-/overuse of solitary confinement. A year later, in September 2022, individuals at Golden State filed another CRCL complaint regarding GEO staff's retaliation against them for joining a labor strike at the facility.[56]

---

[54] Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties from California Collaborative for Immigrant Justice, et al. (Aug. 26, 2021), https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf.

[55] For more information on Golden State's denial of adequate food, *see* Laura Duarte, California Collaborative for Immigrant Justice, *Starving for Justice: The Denial of Proper Nutrition in Immigration Detention* (2022), https://www.ccijustice.org/_files/ugd/733055_c43b1cbbdda341b894045940622a6dc3.pdf.

[56] Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties from Centro Legal de la Raza, et al. (Sept. 13, 2022), https://www.aclunc.org/sites/default/files/Mesa%20Verde%20-%20Golden%20State%20CRCL%20Complaint_09.2 2.pdf.

Two days after the September 2022 complaint was filed, sixteen members of Congress issued a public letter to the Department of Homeland Security ("DHS") Secretary and ICE Director noting the "disturbing conditions and abusive and retaliatory behavior" committed against people detained at Golden State, as well as the "dangerous health risks throughout the facility."[57] The Congressmembers called on ICE to initiate an investigation and end its contract with GEO if the complaint's allegations were substantiated.

In December 2022, the California Occupational Safety and Health Administration ("Cal/OSHA") investigated, cited, and fined GEO for numerous workplace violations at Golden State.[58] At least one of GEO's violations was found to be "willful," resulting in a fine of over $100,000. The fine marked the first time Cal/OSHA penalized a private detention operator for workplace violations.

In early 2023, an ongoing labor strike at Golden State and the nearby Mesa Verde ICE Detention Facility ("Mesa Verde") escalated to a hunger strike, and retaliation against strikers followed. ICE officials and GEO staff resorted to physical violence and excessive force against strikers – including forced transfers of several hunger strikers to a Texas detention facility where they were threatened with force feeding if they did not break their strike – on top of harassment, intimidation, and threats.[59]

In May 2023, Congressmembers submitted a second letter to the DHS Secretary and ICE Director, highlighting ongoing and heightened levels of abuses occurring at Golden State and Mesa Verde.[60] The Congressmembers reiterated their call for ICE to end its contract with GEO at Golden State, if complaints by detained individuals there were confirmed.

Many of the detained people's complaints were recently substantiated in a DHS Office of Inspector General ("OIG") report published earlier this year, resulting from unannounced, in-person inspections at Golden State in April 2023.[61] In its report, DHS OIG found that ICE not only violated its standards, it also misused $25.3 million dollars in payments to GEO for empty bed space.[62] Despite these findings, ICE has not ended its contract with GEO.

The abuses at Golden State have only worsened this year. Tellingly, just before the publication of the April 2023 OIG Report, Golden State's population doubled over a span of

---

[57] Letter from Members of Congress of the United States to Alejandro Mayorkas, Sec'y, U.S. Dep't of Homeland Security, and Tae Johnson, Acting Dir., U.S. Immigration and Customs Enforcement (Sept. 14, 2022), https://7330553c-3dac-4189-926d-9d7bbfbf56ea.usrfiles.com/ugd/733055_1506e41723c045b0a3924140f1268b56.pdf.

[58] *See* U.S. Dept. of Labor, Occupational Safety and Health Admin., Inspection No. 1609228.015, Inspection Detail, https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1609228.015 (last visited Aug. 12, 2024).

[59] *See* First Amended Complaint, *Mendez v. U.S. Immigration and Customs Enforcement*, No. 3:23-cv-00829-TLT (N.D. Cal. Mar. 10, 2023).

[60] Letter from Members of Congress of the United States to Alejandro Mayorkas, Sec'y, U.S. Dep't of Homeland Security, and Tae Johnson, Acting Dir., U.S. Immigration and Customs Enforcement (May 4, 2023), https://7330553c-3dac-4189-926d-9d7bbfbf56ea.usrfiles.com/ugd/733055_6eeb5fed590d44db8e5c02c41102e0b3.pdf.

[61] U.S. Dep't of Homeland Security, Office of Inspector General, OIG-24-23, Results of an Unannounced Inspection of ICE's Golden State Annex in McFarland, California (2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-04/OIG-24-23-Apr24.pdf.

[62] *See* Jenny Huh, *At McFarland ICE detention facility, tax dollars may have been misused*, KGET, May 6, 2024, https://www.kget.com/news/local-news/at-mcfarland-detention-facility-tax-dollars-may-have-been-misused/#:~:text=To%20operate%20Golden%20State%2C%20ICE,population%20was%20only%20136%20inmates.&text=That%20translates%20to%20%2425.3%20million%20in%20excess%20payment.

weeks. The facility was unequipped to provide water, toilet paper, timely and adequate medical care, essential hygiene items, shoes and clean clothing to detained people.[63] Instead of remedying these basic issues, officers at Golden State only increased their retaliation against individuals voicing concern.[64]

The PBNDS requires that detained people have access to a grievance process that allows them to raise violations of detention standards with ICE and GEO.[65] Because ICE does not publish grievance-related data, in 2023 the ACLU of Northern California created a database to capture grievances filed by people detained in California immigration facilities and their ultimate outcome.[66] Of the 355 grievances from Golden State and Mesa Verde, only 7% were found in favor of detained people—the rest were either unfounded, rejected, undecided, or otherwise closed.[67]

Individuals at Golden State have described the grievance system as "useless" and that it fails to "accomplish anything."[68] And although the PBNDS clearly prohibits any retaliation for filing a grievance,[69] people detained at Golden State report experiencing retaliation for grieving. For these reasons, they have resorted to collective action to raise their concerns. But, instead of addressing these concerns, ICE and GEO have only continued to retaliate against those who speak out, as recently demonstrated by their actions at Golden State on April 15 and in the days after.

### III.    ICE and GEO must be held accountable.

Survivors of the A4 Raid have sought redress since April 15 to no avail. Twenty-seven people submitted a collective grievance. GEO responded to the grievance by: denying that they conducted strip searches because people remained in their underwear; alleging that pepper spray was utilized only to "quell the disturbance and regain order" without acknowledging that the "disturbance" was created by the manner in which the officers conducted the raid; denying responsibility for lost and damaged property by claiming that dorm members were at fault, because some individuals threw their personal property after waking up to the chaos; and failing to address all other allegations of wrongdoing in the grievance. In a closed-door meeting on May 29 with San Francisco ICE Enforcement and Removal Operations ("ERO") leadership, they refused to address concerns raised by the undersigned author, CCIJ, about the violent and retaliatory nature of the raid. Instead, local leadership insisted that the officers at Golden State complied with the PBNDS despite abundant evidence to the contrary.

The violations that occurred during and after the April 15 raid are not unique to dormitory A4, or for that matter, to Golden State. Instead, recent history shows a pattern and

---

[63] *See Advocacy Letter: Urgent request to stop new intakes into Golden State Annex*, California Collaborative for Immigrant Justice, https://www.ccijustice.org/advocacy-gsa-population-increase (last visited Aug. 12, 2024).

[64] *See* E-mail from Lisa Knox, Co-Exec. Dir., to Richard Chang, Acting Deputy Field Off. Dir. (Apr. 9, 2024, 12:26 PST), https://drive.google.com/file/d/1TQU5R4chMcGSpw3wf50WbAlBcpH9J2pA/view?usp=sharing.

[65] PBNDS § 6.1(I).

[66] ACLU of Northern California, *The California Immigration Detention Database: Tracking Grievances in ICE's For-Profit Detention Facilities*, https://www.aclunc.org/CA_database (last visited August 2, 2024).

[67] *Id.*

[68] *See also id.* (analyzing over 355 grievances submitted from people detained at Golden State and Mesa Verde, only 7% of which were found in detained people's favor).

[69] PBNDS § 6.2(V)(G).

practice of abuse by GEO staff towards those detained throughout the San Francisco Field Office's Area of Responsibility, and violence when conditions of confinement are protested.[70]

On July 1, the individuals detained in A4, along with other people detained at both Golden State and Mesa Verde, launched a labor strike. The strike has since escalated to a hunger strike at both facilities, which is ongoing at the time of this Complaint. The strikers' demands of ICE Director Patrick J. Lechleitner and Field Office Director Becerra are:

1. End the Mesa Verde and Golden State Annex ICE Detention Contracts by December 2024.

2. Freedom: Review our cases for release fairly.

3. End Solitary Confinement.

4. Stop Violating Your Own Standards: ensure adequate medical care, mental health care and food, and end retaliation.

5. Phone calls: stop charging us to call our families, lawyers, and communities.[71]

However, instead of meeting these demands, ICE and GEO continue to deprive detained people of basic necessities including medical care and free phone calls to their loved ones and lawyers, and they take action against those attempting to raise alarm bells.[72]

Complainants, through the undersigned authors, and in addition to the demands to ICE listed above, hereby ask your offices to:

1. Ensure that the survivors of the A4 Raid are made whole, including by:

---

[70] *See, e.g.*, Footnotes 54, 56, 57, 59, 60, 66 (detailing abuses at nearby Mesa Verde, which is operated by GEO under the same contract authorizing it to operate Golden State), *supra*; *see also* Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties from Centro Legal de la Raza, et al. (Jan. 17, 2023), https://www.aclunc.org/sites/default/files/2023.01.17_Sexually_Abusive_Pat-Downs_Complaint_REDACTED.pdf.

[71] *Current Campaign*, Mesa Verde and Golden State Annex Resistance, https://sites.google.com/ccijustice.org/mv-gsa-resistance/about/current-campaign (last visited Aug. 12, 2024).

[72] *See Standards Violations Ticker*, Mesa Verde and Golden State Annex Resistance, https://sites.google.com/ccijustice.org/mv-gsa-resistance/standards-violations-ticker?authuser=0 (last visited Aug. 14, 2024) (documenting at 574 violations of detention standards since the start of the strike, and noting that the number is likely a gross undercount); *Current Detained Leaders*, Mesa Verde and Golden State Annex Resistance, https://sites.google.com/ccijustice.org/mv-gsa-resistance/community-journal/currently-detained-leaders?authuser=0 (last visited Aug. 12, 2024) (documenting the personal accounts and narratives of strikers); Haley Duval, *Hunger Strike Launch at McFarland ICE Detention Facility to Protest Conditions and Loss of Free Phone Calls*, Kern Sol News, July 12, 2024, https://southkernsol.org/2024/07/12/hunger-strike-launch-at-mcfarland-ice-detention-facility-to-protest-conditions-and-loss-of-free-phone-calls/; Jeanne Kuang, *California says ICE detainees have labor rights. They earn $1 a day scrubbing bathrooms*, Cal Matters, July 18, 2024, https://calmatters.org/politics/capitol/2024/07/detainees-immigrants-labor-rights/; Press Release, San Francisco Public Defender's Office, Detained Individuals, Immigrant Advocates Condemn ICE Ending Free Legal Phone Calls Program (July 31, 2024), https://sfpublicdefender.org/news/2024/07/detained-individuals-immigrant-advocates-condemn-ice-ending-free-legal-phone-calls-program/; *Loss of Free Phone Access – A Critical Lifeline in Detention – Triggers Hunger Strikes*, Detention Watch Network, June 13, 2024, https://www.detentionwatchnetwork.org/pressroom/releases/2024/loss-free-phone-access-critical-lifeline-detention-triggers-hunger-strikes.

   a. Releasing those who are still in ICE custody, and arranging for parole into the United States for those whose decisions to accept deportation orders were influenced by the raid;

   b. Returning or adequately compensating them for their disappeared property; and

   c. Providing compensation and medical/mental health treatment for the physical and mental injuries caused by the raid.

2. Consider this complaint as part of DHS's review of the ICE detention system;

3. Prohibit ICE from detaining people at Golden State and end its contract with GEO related to this facility immediately;

4. Recommend that the PBNDS is revised, as indicated immediately below:

   a. Eliminate the provision of PBNDS § 3.1(A) that penalizes "engaging in or inciting a group demonstration."

   b. Revise PBNDS §§ 2.10(II)(7) & (V)(D)(2)(b) to require individualized reasonable suspicion, based on specific, articulable facts, for any bodily search more intrusive than a limited pat down, including any search in which a person is required to undress to any degree.

   c. Revise PBNDS § 2.10 (V)(D)(2)(a) to clarify that an officer must complete a G-1025 ("Record of Search") for any bodily search more intrusive than a pat down, including any search in which a person is required to undress to any degree.

5. Propose the publication of all use of force incidents in all immigration detention facilities; and

6. Urge ICE to produce all records related to the A4 Raid as requested to ICE's Freedom of Information Act Office by undersigned author LCCRSF, including but not limited to all audio and video recordings related to the events described in above.[73]


We look forward to your response.


Sincerely,

Maria Romani
Maricela Sanchez
**ACLU Foundation of Northern California**

Emily Almendarez
Ana Linares Montoya
Priya Arvind Patel
Mariel Villarreal
**California Collaborative for Immigrant Justice**

---

[73] *See* ICE FOIA Case No. 2024-ICFO-43541.

Victoria Petty
Jordan Wells
**Lawyers' Committee for Civil Rights of the San Francisco Bay Area**

cc:    Patrick J. Lechleitner, ICE Director - Patrick.J.Lechleitner@ice.dhs.gov
       Moises Becerra, ICE ERO San Francisco Field Office Director -
       Moises.Becerra@ice.dhs.gov
       Nancy Gonzalez, ICE ERO San Francisco Assistant Field Office Director -
       Nancy.Gonzalez@ice.dhs.gov
       Minga Wofford, Facility Administrator, Golden State Annex Detention Facility -
       mwofford@geogroup.com

# EXHIBIT 6

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



September 30, 2024

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

**RE: 2024-ICAP-00306, 2024-ICFO-43541**

Dear Victoria Petty:

This is in response to your letter dated 8/30/2024, received 8/30/2024, appealing the U.S. Immigration and Customs Enforcement's (ICE) Freedom of Information Act (FOIA) Office's response to your FOIA request dated 6/26/2024, seeking records pertaining to the Golden State Annex facility at which ICE detainees are held, including:

1)  All records related to any and all complaints made by any detained individual housed in GSA Housing Unit A4 on any day on or between January 1, 2024 to June 1, 2024, about access to basic necessities, including, but not limited to, toilet paper, water, toothpaste, cleaning equipment, indoor temperature control, recreation, batteries, and food, for individuals currently in the dorm and on behalf of individuals in solitary confinement.

2)  All records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024.

3)  All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4.

4)  All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the exterior of Housing Unit A4, including, but not limited to the surrounding hallways, doors, and windows.

5)  All audio and/or video files including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59am April 8, 2024 to 12:01am April 16, 2024, that capture any detained individual who was then-presently assigned to Housing Unit A4 at any time during the specified date range.

Victoria C. Petty
Page 2

6) All relevant policies and procedures for retaining audio and/or video files and records sufficient to show compliance/noncompliance therewith.

7) All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.

8) All documents related to any search for contraband, or any other prohibited item, that was planned for or actually conducted between 11:59pm April 1, 2024 to 12:01am April 16, 2024, including, but not limited to:

   a. Any investigations conducted prior to any search for contraband, and

   b. Records sufficient to identify the basis or bases for the search of Housing Unit A4

   c. Records sufficient to identify the basis for searching the body or belongings of any individuals housed in Housing Unit A4

   d. Any communications regarding any planned or conducted search for contraband.

9) Records sufficient to show all equipment utilized to conduct any search for contraband that was planned for or actually conducted between 11:59am April 14, 2024 to 12:01am April 16, 2024, including but not limited to restraint devices, impact weapons, batons, oleoresin capsicum spray, chemical agents, tactical gear, and personal protection equipment.

10) Records sufficient to show the personnel involved in the planning and/or execution of any search for contraband that was planned for or actually conducted between 11:59pm April 15, 2024 to 12:01am April 16, 2024, including, but not limited to:

    a. The rank, position, or title of the individuals involved in any phase of a contraband search;

    b. The number of individuals involved in any phase of a contraband search; and

    c. The rank, position, or title of any ICE employee who received notice of a contraband search at any stage.

11) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process.

12) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for conducting searches of detained individuals, including, but not limited to, pat downs, strip searches, cavity searches, and visual inspections.

13) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling personal property owned by individuals detained at the facility.

14) All records related to reports of lost or damaged personal property made on or between April 14, 2024 to June 1, 2024, by any individual who was assigned to GSA Housing Unit A4 on any day during that period, including but not limited to:

    a. Forms I-387 Report of Detainees Missing Property;

    b. Reports, oral or written, of allegations of staff mishandling of personal property owned by detained persons; and

Victoria C. Petty
Page 3

    c.   Requests, oral or written, for reimbursement of commissary.

15) All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

16) Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property.

17) Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

    a.   Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;

    b.   Procedures for handling cellular devices confiscated from detained individuals.

18) All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to,

    a.   Forms G1025 submitted by GSA to ICE; and

    b.   Records of investigation conducted by ICE.


      By letter dated 7/9/2024, ICE FOIA acknowledged your FOIA request and denied your request for expedited processing. By letter dated 7/19/2024, you pointed out that ICE FOIA's acknowledgment letter failed to list all sub-parts of your initial FOIA request, failed to address the request for a fee waiver, and failed to provide support for the deadline provided for appeal of the denial of the request for expedited processing. By an amended letter dated 7/25/2024, the ICE FOIA Office again acknowledged your FOIA request, granted your request for a fee waiver, and again denied your request for expedited processing. You have appealed the denial of the request for expedited processing.

*Expedited Treatment*

      In your request, you raised 2 conditions to rationalize expedited processing, "because this FOIA request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information" and "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

Victoria C. Petty
Page 4

By an amended letter dated 7/25/2024, the ICE FOIA Office acknowledged receipt of your FOIA request, granted your request for a fee waiver, and denied your request for expedited processing.  With respect to the latter, the ICE FOIA office stated:

"Your request for expedited treatment is hereby denied.

Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(e)(l)(ii).  Requesters seeking expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct.  6 C.F.R. § 5.5(e)(3).

Your request for expedited processing is denied because you do not qualify for either category under 6 C.F.R. § 5.5(e)(1).  You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally.  Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards."

You have appealed the denial of expedited treatment of your FOIA request.  In your appeal, you argue that your request satisfied at least three of the four bases listed under 6 C.F.R. § 5.5(e)(1) to justify a grant of expedited processing. Specifically, you argue that:

A. Denial of expedited processing threatens the physical safety of the people who survived the A4 Raid and threatens to chill constitutionally protected expression.
B. LCCRSF has an urgent need to inform the public about what happened during and after the A4 Raid.
C. Without expedited processing, the A4 Raid survivors are deprived of evidence to support claims of substantive due process violations that may entitle them to release from detention.

On appeal, ICE employs a *de novo* review of the denial of expedited treatment of your FOIA request.  As a requester, you bear the burden under the FOIA of showing that your request satisfies the requirements for expedited treatment.

The DHS FOIA Regulations at 6 C.F.R. § 5.5(e) provide the following four situations in which expedited processing is warranted:

(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;
(ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information;
(iii) The loss of substantial due process rights; or

Victoria C. Petty
Page 5

(iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

The first situation in which processing on an expedited basis is appropriate requires a showing of circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual. You have not provided any specific evidence demonstrating that standard processing of the request would pose an imminent threat to the life or physical safety of any particular individual. You cite to Exhibit C, which contains your description of actions taken against detained individuals which you claim caused harm, and makes conclusory statements such as there being no reasons for officers to believe that the requirements for purported use of force that met the guidelines required under the Performance-Based National Detention Standards (PBNDS). However, Exhibit C is a demand letter from various organizations, including your own, to DHS, and is not independent evidence. This exhibit does not satisfy the burden for this situation as it comprises conclusory statements and argument, and does not provide any evidentiary support that there is any imminent threat to life or physical safety of an individual without expedited processing of your request.

The second situation in which processing on an expedited basis is appropriate has two prongs. The first requirement is that there is an "urgency to inform the public about an actual or alleged federal government activity." The second requirement is that the requester "is primarily engaged in disseminating information." You have not demonstrated an urgency to inform the public about a federal government activity.

The "urgency to inform the public" prong determination hinges on three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004). The first two factors have not been satisfied in that you have not demonstrated that the request concerns a matter of current exigency to the American public, or that a delay in response would itself compromise a significant recognized interest. You argue that:

> "LCCRSF uses information dissemination, like that sought by the Request, to participate in the democratic process and to balance the scales of power with large government agencies. And the scale of abuse and injury that occurred during the April 15 raid demands exactly the type of public dialog and accountability that LCCRSF can facilitate."

In support, you point to an example that LCCRSF published a report in March 2019 concerning car towing fees, which was used by the California legislature in passing a bill addressing these issues in February 2023. Your argument and examples, however, do not demonstrate either prong. Your primary example shows a roughly 4-year timeframe between publication of information and implementation of governmental response. Your arguments do not demonstrate why the instant information sought is needed in a more exigent fashion. Also, you do not delineate what significant recognized interests would be compromised with a delay in

Victoria C. Petty
Page 6

response, beyond a general argument that GSA, and GEO, has a history of complaints from nonprofit organizations, past fines for workplace violations, and potential misuse of public funds for empty bed space. Therefore, neither of the first two factors have been met.

With regard to the third situation in which processing on an expedited basis is appropriate ("[t]he loss of substantial due process rights"), you have not made a showing of a loss of substantial due process rights. Generally, a request may be expedited if it is shown that substantial due process rights of the requester would be impaired by the failure to process immediately, and that the information sought is not otherwise available. It is not sufficient, however, for a requester to merely allege that requested records are needed in connection with some judicial or administrative proceeding; rather, the immediate use of the FOIA must be shown to be critical to the preservation of a substantial right. Moreover, a pending civil suit does not generally qualify a FOIA demand for expedited processing, *Rivera v. DEA*, 2 GDS, 81,365 at 81,953 (D.D.C. 1981). Additionally, in *Mitsubishi Electric Corp. v. Department of Justice*, 39 Ad. L. Rep.2d (P&F) 1133, 1140-42 (D.D.C. 1976), the Court pointedly refused to order expedited processing where a requester had not availed itself of existing civil discovery mechanisms for obtaining the records sought. You may also request the relevant documents to the proceeding from the Assistant Chief Counsel assigned to your case at the Office of Principal Legal Advisor (OPLA) through the *Dent* process, and/or you may submit a FOIA request to USCIS for the A-file. You may find more information about how to submit a FOIA request directly to USCIS at www.uscis.gov/foia.

You have not shown how any substantial due process rights of you, the requestor, would be impaired without expedited processing. Likewise, you have not shown how any substantial due process rights of individuals detained by ICE will be lost or impaired, beyond a general argument that they may be deprived of opportunities to seek release or bond hearings. You point to purported statements of GEO officers that the alleged raid's purpose was punitive, referring to Section A, but anything in Section A related to alleged punitive action has no demonstrated link to bond hearings, or detainees being unable to seek release from detention through established procedures and processes.

With regard to the fourth situation in which processing on an expedited basis is appropriate, you have not claimed that you satisfy this situation in your appeal. Nevertheless, you have not made a showing regarding the existence of possible questions about the government's integrity which would affect public confidence.

Therefore, ICE affirms the decision of ICE FOIA to deny your request for expedited processing.

However, upon a complete review of the administrative record, ICE has determined that a search was tasked but new searches or modifications to the existing searches could be made. We are therefore remanding your appeal to the ICE FOIA Office for the completion of processing, including re-tasking to the appropriate agency/office(s) to obtain any responsive documents. The ICE FOIA Office will respond directly to you.

Victoria C. Petty
Page 7

Should you have any questions regarding this appeal decision, please contact ICE at ice-foia@dhs.gov.  In the subject line of the email please include the word "appeal," your appeal number, which is **2024-ICAP-00306**, and the FOIA case number, which is **2024-ICFO-43541**.

Sincerely,

/s/ *Ari Fried*

*for*  Sara Jazayeri
Chief
Government Information Law Division
ICE Office of the Principal Legal Advisor
U.S. Department of Homeland Security

cc:      The ICE FOIA Office

# EXHIBIT 7



November 4, 2024

**SENT VIA EMAIL**

U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009
ICE-FOIA@ICE.DHS.GOV

U.S. Immigration and Customs Enforcement Office of the Principal Legal Advisor
500 12th Street, S.W., Mail Stop 5900
Washington D.C. 20536-5900
GILDFOIAAppeals@ice.dhs.gov

**Re:    Request for information about the processing status of 2024-ICFO-43541**

I write to request a status update on ICE's processing of FOIA Request (2024-ICFO-43541). **Exhibit 1**. The last correspondence our office received about the Request responded to our appeal of ICE's decision to deny expedited processing. **Exhibit 2**. The letter, dated September 30, 2024, originated from Ari Fried on behalf of the Government Information Law Division of the ICE Office of the Principal Legal Advisor. The letter stated: "[U]pon a complete review of the administrative record, ICE has determined that a search was tasked but new searches or modifications to the existing searches could be made. We are therefore remanding your appeal to the ICE FOIA Office for the completion of processing, including re-tasking to the appropriate agency/office(s) to obtain any responsive documents. The ICE FOIA Office will respond directly to you."

Over a month has passed since Ms. Fried's letter, and the ICE FOIA Office has still not responded to our Request.[1] We seek information about ICE's processing of the Request.

- What is meant by "ICE has determined that a search was tasked by new searches or modifications of the existing searches could be made"?

---

[1] ICE's response to the Request is over 80 days late. ICE acknowledged the Request's receipt on June 26, 2024, therefore ICE's response to the Request was due on August 8, 2024. *See* 5 U.S.C. §§ 552(a)(6)(A), (B).

1

- Has ICE already completed a full search for the records at issue in the Request?
- Does ICE have a projected timeline for issuing the substantive response and producing the requested records?

Our office's goal is to work collaboratively with the agency in a non-adversarial process to obtain the public records. However, our obligation to defend civil and constitutional rights comes first. The records requested pertain to a violent raid on detained people executed by ICE's private immigration detention contractor. Untimely production of the public records about that event impedes the victims' ability to seek judicial remedies to which they may be legally entitled. Our office will be forced to file litigation absent ICE's timely response and production.

Thank you for your prompt attention to this request for information about the status of 2024-ICFO-43541.


Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105
Email: vpetty@lccrsf.org
Phone: 415-543-9444

2

# EXHIBIT 1



June 26, 2024

**SENT VIA EMAIL (ICE-FOIA@ICE.DHS.GOV)**

U.S. Immigration and Customs Enforcement ("ICE")
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009

Re:    **FOIA Request**

      The Lawyers' Committee for Civil Rights of the San Francisco Bay Area ("LCCRSF" or "Requester") submits this letter as a request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*.  Requester seeks a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k), and expedited processing, pursuant to 6 C.F.R. § 5.5(d) and 5 U.S.C. § 552(a)(6)(E).  Requester's entitlement to the fee waiver and expedited processing are set out in detail following the request for information.

## I.    REQUEST FOR INFORMATION

      Requester seeks all records[1] listed below in the possession or control of the U.S. Immigration & Customs Enforcement (ICE)[2].  All specific requests for information relate to Golden State Annex, the facility with which ICE contracts to detain noncitizens, located at 611 Frontage Road, McFarland, California 93250.  ICE retains and exercises legal custody over individuals detained at GSA.  GEO Group, Inc. ("GEO"), a private corporation, merely operates GSA at ICE's behest in exchange for compensation.  As such, any document within GEO's possession relating to the operation of GSA and detention of noncitizens is plainly within ICE's control.  *See, e.g., Ahn v. GEO Group, Inc.*, 1:22-cv-00586-CDB, ECF 64-1 at 466 (E.D. Cal)

---

[1] The term "records" as used herein includes, but is not limited to: communications, correspondence, directives, documents, data, videotapes, audiotapes, e-mails, faxes, files, guidance, guidelines, standards, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training materials, and studies, including records kept in written form, or electronic format on computers and/or other electronic storage devices, electronic communications and/or videotapes, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations

[2] The term "ICE" as used herein means ICE headquarters offices, including any divisions, subdivisions or sections therein; ICE's San Francisco Field Office; and/or any other ICE organizational structures that have possession, custody, and/or control over the requested information.

("The Contractor shall safeguard all records related to the operation of the facility. All records will remain the property of the U.S. Government."). Requester asks that ICE produce all records within the scope of the specific requests, even if ICE must first obtain those records from GEO. This is an ongoing FOIA request, such that any records that come within ICE's possession prior to a final response to this FOIA request are within the request's scope.

The requested records include:

1) All records related to any and all complaints[3] made by any detained individual housed in GSA Housing Unit A4[4] on any day on or between January 1, 2024 to June 1, 2024, about access to basic necessities, including, but not limited to, toilet paper, water, toothpaste, cleaning equipment, indoor temperature control, recreation, batteries, and food, for individuals currently in the dorm and on behalf of individuals in solitary confinement.

2) All records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024.

3) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4.

4) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the exterior of Housing Unit A4, including, but not limited to the surrounding hallways, doors, and windows.

5) All audio and/or video files including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59am April 8, 2024 to 12:01am April 16, 2024, that capture any detained individual who was then-presently assigned to Housing Unit A4 at any time during the specified date range.

6) All relevant policies and procedures for retaining audio and/or video files and records sufficient to show compliance/noncompliance therewith.

7) All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.

8) All documents related to any search for contraband, or any other prohibited item, that was planned for or actually conducted between 11:59pm April 1, 2024 to 12:01am April 16, 2024, including, but not limited to:

---

[3] ICE should construe any request that uses the term "complaint" to refer to formal grievances (whether provided in writing or electronically through the facility's tablets), verbal complaints or notifications made by detained people to GEO staff and/or ICE, reports made to ICE including to the Office of the Immigration Detention Ombudsmen from detained people or GEO staff, and any other form of notice communicated by a detained individuals.

[4] ICE should construe any request that uses the term "Housing Unit" to include records that contain similar terms, including, but not limited to "dormitory," "dorm," or simply the letter and number combination that is assigned to the location where groups of detained individuals are housed inside of the facility.

a.  Any investigations conducted prior to any search for contraband, and

b.  Records sufficient to identify the basis or bases for the search of Housing Unit A4

c.  Records sufficient to identify the basis for searching the body or belongings of any individuals housed in Housing Unit A4

d.  Any communications regarding any planned or conducted search for contraband.

9)  Records sufficient to show all equipment utilized to conduct any search for contraband that was planned for or actually conducted between 11:59am April 14, 2024 to 12:01am April 16, 2024, including but not limited to restraint devices, impact weapons, batons, oleoresin capsicum spray,[5] chemical agents, tactical gear, and personal protection equipment.

10) Records sufficient to show the personnel involved in the planning and/or execution of any search for contraband that was planned for or actually conducted between 11:59pm April 15, 2024 to 12:01am April 16, 2024, including, but not limited to:

a.  The rank, position, or title of the individuals involved in any phase of a contraband search;

b.  The number of individuals involved in any phase of a contraband search; and

c.  The rank, position, or title of any ICE employee who received notice of a contraband search at any stage.

11) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process.

12) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for conducting searches of detained individuals, including, but not limited to, pat downs, strip searches, cavity searches, and visual inspections.

13) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling personal property owned by individuals detained at the facility.

14) All records related to reports of lost or damaged personal property made on or between April 14, 2024 to June 1, 2024, by any individual who was assigned to GSA Housing Unit A4 on any day during that period, including but not limited to:

a.  Forms I-387 Report of Detainees Missing Property;

b.  Reports, oral or written, of allegations of staff mishandling of personal property owned by detained persons; and

c.  Requests, oral or written, for reimbursement of commissary.

15) All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

---

[5] ICE should construe any request that uses the term "oleoresin capsicum spray" to include records that contain similar terms, including, but not limited to "OC spray," "pepper spray," "mace," or any other similar term.

16) Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property.

17) Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

   a. Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;

   b. Procedures for handling cellular devices confiscated from detained individuals.

18) All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to,

   a. Forms G1025 submitted by GSA to ICE; and

   b. Records of investigation conducted by ICE.

Any records that exist in electronic form should be provided in their native electronic format on a compact disc, digital videodisk, or equivalent electronic medium. Any documents stored in Portable Document Format ("PDFs") should be provided as individual files in a searchable PDF format. Any records produced in PDF, TIFF, or other image formats must be produced in full, uncompressed form; do not compress images or alter the resolution, as this interferes with their legibility. Finally, Requester asks that ICE transmit reasonable metadata along with files, including but not limited to maintaining parent-child relationships between emails and their attachments, author information, as well as date and time stamp information. To facilitate a speedy response, Requester asks that records responsive to this request be produced on a rolling basis.

All requested records that are responsive may be provided with personally identifying details redacted according to 5 U.S.C. § 552(b)(6). Requester expects the release of all segregable portions of otherwise exempt material.

If, under applicable law, any of the information requested is considered exempt, please describe in detail the nature of the information withheld, the specific exemption or privilege upon which the information is withheld, and whether the portions of withheld documents containing non-exempt or non-privileged information have been provided.

## II.   REQUEST FOR EXPEDITED PROCESSING

Requester seeks expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). Expedited processing is appropriate, under 6 C.F.R. § 5.5(e)(1), because this FOIA request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information" and "[a] matter of widespread and

exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

LCCRSF is a nonprofit entity under Section 501(c)(3) of the Internal Revenue Code. Dedicated to ensuring civil rights protections and access to justice for all immigrants, refugees, and asylum seekers, LCCRSF provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. LCCRSF's primary purpose in making this FOIA request is to inform the legal community and the public, specifically in California, about the detention of noncitizens at GSA. Providing the requested information on an expedited basis is justified because the information will contribute to public understanding of current practices at GSA, as well as identifying potential grounds for seeking adjustment to such practices. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017) (ordering expedited processing where information dissemination is an "activity of the requestor" even if not its "sole occupation"); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing for an organization that "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by the Department of Justice").

## III. REQUEST FOR WAIVER OF FEES

LCCRSF is also eligible for waiver of any fees associated with this FOIA request. Such a waiver is warranted because disclosure of the information is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge or at a reduced rate if the information is in the public interest, and disclosure is not in commercial interest of institution). In addition, LCCRSF can widely disseminate the requested information to its networks of immigrants' rights organizations and to the public. *See Judicial Watch v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) (finding a fee waiver appropriate when the requester explained how and to whom it would disseminate the information it received).

As described above, LCCRSF is a non-profit organization committed to increasing public understanding of immigration law and policy, advocating for the fair and just administration of civil rights laws, and protecting the legal rights of noncitizens and citizens alike. LCCRSF utilizes information it receives in response to public records requests to increase community awareness of matters of public concern. *See, e.g., Civil Assessments: The Hidden Court Fee That Penalizes Poverty*, https://lccrsf.org/wp-content/uploads/2022/03/Civil-Assessments-Report-FINAL.pdf; *Cited for Being in Plain Sight: How California Polices Being Black, Brown, and Unhoused in Public*, https://lccrsf.org/wpcontent/uploads/LCCR_CA_Infraction_report_ 4WEB-1.pdf. The purpose of this request is not commercial gain, rather as a not-for-profit organization, Requester seeks the information to execute its commitments and obligations to the public.

****

Please provide the applicable records to:

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

Email: vpetty@lccrsf.org
Phone: 415-543-9444

Thank you, in advance, for your prompt attention to this request.

_____

Victoria C. Petty

# EXHIBIT 2

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536



September 30, 2024

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105

**RE: 2024-ICAP-00306, 2024-ICFO-43541**

Dear Victoria Petty:

     This is in response to your letter dated 8/30/2024, received 8/30/2024, appealing the U.S. Immigration and Customs Enforcement's (ICE) Freedom of Information Act (FOIA) Office's response to your FOIA request dated 6/26/2024, seeking records pertaining to the Golden State Annex facility at which ICE detainees are held, including:

1) All records related to any and all complaints made by any detained individual housed in GSA Housing Unit A4 on any day on or between January 1, 2024 to June 1, 2024, about access to basic necessities, including, but not limited to, toilet paper, water, toothpaste, cleaning equipment, indoor temperature control, recreation, batteries, and food, for individuals currently in the dorm and on behalf of individuals in solitary confinement.

2) All records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024.

3) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4.

4) All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the exterior of Housing Unit A4, including, but not limited to the surrounding hallways, doors, and windows.

5) All audio and/or video files including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA, from 11:59am April 8, 2024 to 12:01am April 16, 2024, that capture any detained individual who was then-presently assigned to Housing Unit A4 at any time during the specified date range.

Victoria C. Petty
Page 2

6) All relevant policies and procedures for retaining audio and/or video files and records sufficient to show compliance/noncompliance therewith.

7) All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.

8) All documents related to any search for contraband, or any other prohibited item, that was planned for or actually conducted between 11:59pm April 1, 2024 to 12:01am April 16, 2024, including, but not limited to:
   a. Any investigations conducted prior to any search for contraband, and
   b. Records sufficient to identify the basis or bases for the search of Housing Unit A4
   c. Records sufficient to identify the basis for searching the body or belongings of any individuals housed in Housing Unit A4
   d. Any communications regarding any planned or conducted search for contraband.

9) Records sufficient to show all equipment utilized to conduct any search for contraband that was planned for or actually conducted between 11:59am April 14, 2024 to 12:01am April 16, 2024, including but not limited to restraint devices, impact weapons, batons, oleoresin capsicum spray, chemical agents, tactical gear, and personal protection equipment.

10) Records sufficient to show the personnel involved in the planning and/or execution of any search for contraband that was planned for or actually conducted between 11:59pm April 15, 2024 to 12:01am April 16, 2024, including, but not limited to:
   a. The rank, position, or title of the individuals involved in any phase of a contraband search;
   b. The number of individuals involved in any phase of a contraband search; and
   c. The rank, position, or title of any ICE employee who received notice of a contraband search at any stage.

11) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process.

12) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for conducting searches of detained individuals, including, but not limited to, pat downs, strip searches, cavity searches, and visual inspections.

13) Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling personal property owned by individuals detained at the facility.

14) All records related to reports of lost or damaged personal property made on or between April 14, 2024 to June 1, 2024, by any individual who was assigned to GSA Housing Unit A4 on any day during that period, including but not limited to:
   a. Forms I-387 Report of Detainees Missing Property;
   b. Reports, oral or written, of allegations of staff mishandling of personal property owned by detained persons; and

Victoria C. Petty
Page 3

    c.  Requests, oral or written, for reimbursement of commissary.

15) All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.

16) Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property.

17) Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

    a.  Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;

    b.  Procedures for handling cellular devices confiscated from detained individuals.

18) All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to,

    a.  Forms G1025 submitted by GSA to ICE; and

    b.  Records of investigation conducted by ICE.


By letter dated 7/9/2024, ICE FOIA acknowledged your FOIA request and denied your request for expedited processing. By letter dated 7/19/2024, you pointed out that ICE FOIA's acknowledgment letter failed to list all sub-parts of your initial FOIA request, failed to address the request for a fee waiver, and failed to provide support for the deadline provided for appeal of the denial of the request for expedited processing. By an amended letter dated 7/25/2024, the ICE FOIA Office again acknowledged your FOIA request, granted your request for a fee waiver, and again denied your request for expedited processing. You have appealed the denial of the request for expedited processing.

*Expedited Treatment*

In your request, you raised 2 conditions to rationalize expedited processing, "because this FOIA request involves "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information" and "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

Victoria C. Petty
Page 4

By an amended letter dated 7/25/2024, the ICE FOIA Office acknowledged receipt of your FOIA request, granted your request for a fee waiver, and denied your request for expedited processing.  With respect to the latter, the ICE FOIA office stated:

"Your request for expedited treatment is hereby denied.

Under the DHS FOIA regulations, expedited processing of a FOIA request is warranted if the request involves "circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," 6 C.F.R. § 5.5(e)(1)(i), or "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information," 6 C.F.R. § 5.5(e)(l)(ii).  Requesters seeking expedited processing must submit a statement explaining in detail the basis for the request, and that statement must be certified by the requester to be true and correct.  6 C.F.R. § 5.5(e)(3).

Your request for expedited processing is denied because you do not qualify for either category under 6 C.F.R. § 5.5(e)(1).  You failed to demonstrate a particular urgency to inform the public about the government activity involved in the request beyond the public's right to know about government activity generally.  Your letter was conclusory in nature and did not present any facts to justify a grant of expedited processing under the applicable standards."

You have appealed the denial of expedited treatment of your FOIA request.  In your appeal, you argue that your request satisfied at least three of the four bases listed under 6 C.F.R. § 5.5(e)(1) to justify a grant of expedited processing. Specifically, you argue that:

A. Denial of expedited processing threatens the physical safety of the people who survived the A4 Raid and threatens to chill constitutionally protected expression.
B. LCCRSF has an urgent need to inform the public about what happened during and after the A4 Raid.
C. Without expedited processing, the A4 Raid survivors are deprived of evidence to support claims of substantive due process violations that may entitle them to release from detention.

On appeal, ICE employs a *de novo* review of the denial of expedited treatment of your FOIA request.  As a requester, you bear the burden under the FOIA of showing that your request satisfies the requirements for expedited treatment.

The DHS FOIA Regulations at 6 C.F.R. § 5.5(e) provide the following four situations in which expedited processing is warranted:

(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual;
(ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information;
(iii) The loss of substantial due process rights; or

Victoria C. Petty
Page 5

(iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence.

The first situation in which processing on an expedited basis is appropriate requires a showing of circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual. You have not provided any specific evidence demonstrating that standard processing of the request would pose an imminent threat to the life or physical safety of any particular individual. You cite to Exhibit C, which contains your description of actions taken against detained individuals which you claim caused harm, and makes conclusory statements such as there being no reasons for officers to believe that the requirements for purported use of force that met the guidelines required under the Performance-Based National Detention Standards (PBNDS). However, Exhibit C is a demand letter from various organizations, including your own, to DHS, and is not independent evidence. This exhibit does not satisfy the burden for this situation as it comprises conclusory statements and argument, and does not provide any evidentiary support that there is any imminent threat to life or physical safety of an individual without expedited processing of your request.

The second situation in which processing on an expedited basis is appropriate has two prongs. The first requirement is that there is an "urgency to inform the public about an actual or alleged federal government activity." The second requirement is that the requester "is primarily engaged in disseminating information." You have not demonstrated an urgency to inform the public about a federal government activity.

The "urgency to inform the public" prong determination hinges on three factors: (1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity. *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004). The first two factors have not been satisfied in that you have not demonstrated that the request concerns a matter of current exigency to the American public, or that a delay in response would itself compromise a significant recognized interest. You argue that:

> "LCCRSF uses information dissemination, like that sought by the Request, to participate in the democratic process and to balance the scales of power with large government agencies. And the scale of abuse and injury that occurred during the April 15 raid demands exactly the type of public dialog and accountability that LCCRSF can facilitate."

In support, you point to an example that LCCRSF published a report in March 2019 concerning car towing fees, which was used by the California legislature in passing a bill addressing these issues in February 2023. Your argument and examples, however, do not demonstrate either prong. Your primary example shows a roughly 4-year timeframe between publication of information and implementation of governmental response. Your arguments do not demonstrate why the instant information sought is needed in a more exigent fashion. Also, you do not delineate what significant recognized interests would be compromised with a delay in

Victoria C. Petty
Page 6

response, beyond a general argument that GSA, and GEO, has a history of complaints from nonprofit organizations, past fines for workplace violations, and potential misuse of public funds for empty bed space. Therefore, neither of the first two factors have been met.

With regard to the third situation in which processing on an expedited basis is appropriate ("[t]he loss of substantial due process rights"), you have not made a showing of a loss of substantial due process rights. Generally, a request may be expedited if it is shown that substantial due process rights of the requester would be impaired by the failure to process immediately, and that the information sought is not otherwise available. It is not sufficient, however, for a requester to merely allege that requested records are needed in connection with some judicial or administrative proceeding; rather, the immediate use of the FOIA must be shown to be critical to the preservation of a substantial right. Moreover, a pending civil suit does not generally qualify a FOIA demand for expedited processing, *Rivera v. DEA*, 2 GDS, 81,365 at 81,953 (D.D.C. 1981). Additionally, in *Mitsubishi Electric Corp. v. Department of Justice*, 39 Ad. L. Rep.2d (P&F) 1133, 1140-42 (D.D.C. 1976), the Court pointedly refused to order expedited processing where a requester had not availed itself of existing civil discovery mechanisms for obtaining the records sought. You may also request the relevant documents to the proceeding from the Assistant Chief Counsel assigned to your case at the Office of Principal Legal Advisor (OPLA) through the *Dent* process, and/or you may submit a FOIA request to USCIS for the A-file. You may find more information about how to submit a FOIA request directly to USCIS at www.uscis.gov/foia.

You have not shown how any substantial due process rights of you, the requestor, would be impaired without expedited processing. Likewise, you have not shown how any substantial due process rights of individuals detained by ICE will be lost or impaired, beyond a general argument that they may be deprived of opportunities to seek release or bond hearings. You point to purported statements of GEO officers that the alleged raid's purpose was punitive, referring to Section A, but anything in Section A related to alleged punitive action has no demonstrated link to bond hearings, or detainees being unable to seek release from detention through established procedures and processes.

With regard to the fourth situation in which processing on an expedited basis is appropriate, you have not claimed that you satisfy this situation in your appeal. Nevertheless, you have not made a showing regarding the existence of possible questions about the government's integrity which would affect public confidence.

Therefore, ICE affirms the decision of ICE FOIA to deny your request for expedited processing.

However, upon a complete review of the administrative record, ICE has determined that a search was tasked but new searches or modifications to the existing searches could be made. We are therefore remanding your appeal to the ICE FOIA Office for the completion of processing, including re-tasking to the appropriate agency/office(s) to obtain any responsive documents. The ICE FOIA Office will respond directly to you.

Victoria C. Petty
Page 7

Should you have any questions regarding this appeal decision, please contact ICE at ice-foia@dhs.gov.  In the subject line of the email please include the word "appeal," your appeal number, which is **2024-ICAP-00306**, and the FOIA case number, which is **2024-ICFO-43541**.

Sincerely,

/s/ *Ari Fried*

*for*    Sara Jazayeri
Chief
Government Information Law Division
ICE Office of the Principal Legal Advisor
U.S. Department of Homeland Security

cc:    The ICE FOIA Office

# EXHIBIT 8

**From:** ice-foia@ice.dhs.gov <noreply@securerelease.us>
**Date:** Thursday, November 7, 2024 at 11:45 AM
**To:** Victoria Petty <vpetty@lccrsf.org>
**Subject:** ICE FOIA 2024-ICAP-00306

11/07/2024

Victoria  Petty
131 Steuart St #400
San Francisco, California 94105

RE:       ICE FOIA 2024-ICAP-00306

Dear Requester:

This email is in response to your status inquiry regarding ICE FOIA 2024-ICAP-00306, in which you have requested  records related to any and all complaints3 made by any detained individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video

1

files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property. Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

a. Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;
b. Procedures for handling cellular devices confiscated from detained individuals.

All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to, Forms G1025 submitted by GSA to ICE; and Records of investigation conducted by ICE. .

As of today, the search for responsive documents is complete and your request is currently in queue to be processed. If responsive records have been located, they will be reviewed for a determination of releasability.

ICE FOIA apologizes for the delay in the processing of your request. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions, please contact FOIA Public Liaison, Daniel Edgington at the address above or (866) 633-1182. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned reference number 2024-ICAP-00306. Please use this number in future correspondence.

Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009

# EXHIBIT 9



December 10, 2024

**SENT VIA EMAIL**

U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act Office
ICE-FOIA@ICE.DHS.GOV

U.S. Immigration and Customs Enforcement Office of the Principal Legal Advisor
GILDFOIAAppeals@ice.dhs.gov

**Re:    Final demand for response to FOIA Request**

I write to tender a final demand that ICE respond to our FOIA Request, submitted on June 26, 2024 (2024-ICAP-00306, originally assigned 2024-ICFO-43541). ICE's deadline to respond passed over four months ago on August 8, 2024. *See* 5 U.S.C. §§ 552(a)(6)(A), (B). According to the last correspondence we received on November 7, 2024, "the search for responsive documents [was] complete" and responsive records were being "reviewed for a determination of releasability." Exhibit 1. We have yet to receive any response or document production.

As previously noted, the untimely production of the requested records obstructs our office's obligation to defend the civil and constitutional rights of people in immigration detention who were subjected to a violent raid on April 15, 2024. Should ICE not begin production of the records on or before December 20, 2024, we will be forced to file suit in federal court.

Victoria C. Petty
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, California 94105
Email: vpetty@lccrsf.org

# EXHIBIT 1

 Outlook

---

## ICE FOIA 2024-ICAP-00306

**From** ice-foia@ice.dhs.gov <noreply@securerelease.us>
**Date** Thu 11/7/2024 1:45 PM
**To** Victoria Petty <vpetty@lccrsf.org>

11/07/2024

Victoria Petty
131 Steuart St #400
San Francisco, California 94105

RE: ICE FOIA 2024-ICAP-00306

Dear Requester:

This email is in response to your status inquiry regarding ICE FOIA 2024-ICAP-00306, in which you have requested records related to any and all complaints3 made by any detained individual housed in GSA Housing Unit A44 on any day on or between January 1, 2024 to June 1, 2024. records related to any and all uses of force, physical restraint devices or techniques, impact weapons, batons, firearms, chemical agents, and oleoresin capsicum spray, planned or executed by GSA on any day on or between 11:59pm April 8, 2024 to 12:01am April 16, 2024. All audio and/or video files, including, but not limited to, handheld camera recordings and closed-circuit television footage, recorded at GSA from 11:59pm April 8, 2024 to 12:01am April 16, 2024, that capture audio or video from the interior of Housing Unit A4. All records related to any group demonstration planned and/or carried out by detained individuals on April 13, 2024.Records sufficient to show GSA's policies, procedures, and training manuals and presentations for handling contraband, including, but not limited to, investigation, seizure of contraband, disputed ownership, property defined as contraband, and the preservation, inventory, and storage of contraband pending further process. All records related to any incident or allegation of GSA staff misconduct, where such alleged or actual misconduct occurred on or between April 8, 2024 through April 16, 2024, concerning the treatment of detained individuals, use of force, or compliance with detention standards and/or the provisions of GSA's contract with ICE.Records sufficient to show GSA's written policies, procedures, and training manuals and presentations related to lost or damaged personal property belonging to detained
individuals, including, but not limited to, procedures for investigating the whereabouts and ownership of personal property, determining whether GSA staff was at fault for personal property loss or damage, and for reimbursing the value of lost or damaged personal property. Records sufficient to show GSA's policies regarding the use of cellular devices by individuals detained at GSA, including, but not limited to smartphones, tablets, pagers, and other communication technology, including but not limited to:

a. Rules prohibiting the possession or use of cellular devices on GSA's premises by detained individuals;
b. Procedures for handling cellular devices confiscated from detained individuals.

All records related to body searches, including, but not limited to, pat searches, strip searches, and any other form of visual inspection, of individuals assigned to GSA Housing Unit A4 by GSA personnel planned and/or conducted on or between April 13, 2024 to April 16, 2024, including, but not limited to, Forms G1025 submitted by GSA to ICE; and Records of investigation conducted by ICE. .

As of today, the search for responsive documents is complete and your request is currently in queue to be processed. If responsive records have been located, they will be reviewed for a determination of releasability.

ICE FOIA apologizes for the delay in the processing of your request. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions, please contact FOIA Public Liaison, Daniel Edgington at the address above or (866) 633-1182. Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

Your request has been assigned reference number 2024-ICAP-00306. Please use this number in future correspondence.


Sincerely,

ICE FOIA Office
Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009